WILLIAM RHEA v. STATE OF NEBRASKA.

FILED JANUARY 8, 1901.   No. 12,116.

1. Criminal Code: AMENDMENT: DEATH PENALTY: LIFE IMPRISONMENT: QUALIFICATION OF JUROR: REPEAL OF STATUTE. The amendment of section 3 of Criminal Code in 1893, authorizing a jury to determine whether, upon conviction, the accused should suffer the death penalty or be imprisoned in the penitentiary during life, does not have the effect of repealing the law with reference to the qualifications of jurors in prosecutions for offenses where the penalty may be death. *Hill v. State*, 42 Nebr., 503.

2. Challenge for Cause: CAPITAL PUNISHMENT: CONSCIENTIOUS SCRUPLES. The entertaining of conscientious scruples against capital punishment is a ground for challenge for cause in the prosecution for murder in the first degree. *Dinsmore v. State*, 61 Nebr., 418.

3. ———: ———. In order to render a juror incompetent, it is not required that his opinions and scruples against the infliction of capital punishment should be such as to absolutely forbid him under any circumstances from rendering a verdict inflicting the death penalty.

4. ———: ———. When a juror entertains opinions or conscientious scruples against imposing the death penalty such as will bias his judgment and influence him in the consideration of the evidence as applied to the law, or if his answers leave his qualifications on that point in doubt or uncertainty, it is not error for the trial court to excuse him on the state's challenge for cause.

5. Qualification of Juror: JUDICIAL DISCRETION. In the determination of the qualification of jurors in a criminal prosecution, a discretion or latitude is given the trial court which is greater when exercised in excusing jurors from serving where their qualifications are in doubt than in their retention.

6. Challenge for Cause: REVIEW. The finding of the trial court in deciding a challenge for cause will not be set aside by the appellate court, unless manifest error appears. *Basye v. State*, 45 Nebr., 261.

7. ———: ———: Not Erroneous. Rulings of trial court in excusing certain jurors on the state's challenge for cause *held* not to be erroneous.

8. Homicide: Murder in First Degree. Homicide committed in the perpetration or attempt to perpetrate any rape, arson, robbery or burglary is by section 3 of the Criminal Code declared murder in the first degree. The turpitude of the act is, in the exceptional cases mentioned in the statute, made to supply the place of deliberate and premeditated malice, while a purpose to kill is conclusively presumed from the intention which is the essence of the enumerated felonies. *Morgan v. State,* 51 Nebr., 672, reexamined and adhered to.

9. Adopting a Statute: Judicial Construction. The rule that, in adopting a statute from another state which has been judicially construed, the legislature also adopts the construction thus placed on the statute, is not absolute in all cases, amounting to a conclusive presumption. And where such adopted statute is not in all respects the same, and has been altered by amendment in respect to a matter and on a point regarding which the prior construction largely rested, and such construction is deemed unsatisfactory in reasoning and opposed to the great weight of authority, the court of the adopting state is not absolutely bound by such prior construction, but is warranted in refusing to adopt or follow the same.

10. Murder in First Degree: Instruction. It is not error to instruct the jury that it is sufficient to constitute murder in the first degree, "if there was such design and determination to kill distinctly formed in the mind at any moment before or at the time the blow was struck," where the remainder of the instruction properly defines "purpose," "deliberation" and "premeditation," and states that the proposed act must have been deliberated and premeditated upon before it was committed, and it is evident that the language quoted referred to the existence of the purpose and not the time of its formation. *Carleton v. State,* 43 Nebr., 373, followed.

11. Instruction: Construction. An instruction should be construed as a whole, and not by its division into fragmentary parts.

12. Murder in First Degree: Instruction. Where it is stated in an instruction that the act of killing, to constitute murder in the first degree must be performed in furtherance of the design or purpose previously formed, the instruction is not rendered erroneous because further on in the same instruction it is said "If a person has actually formed the purpose maliciously to kill, and has deliberated and premeditated upon it before he performs the act, and then performs it, he is guilty of murder in the first degree," without reiterating that the act must have been done in pursuance of the previously formed design.

13. **Instruction:** REFUSAL. An instruction which has no foundation in the evidence upon which to base it, is properly refused.

14. ——: CUMULATIVE: REFUSAL. An instruction regarding a point which has been substantially covered and included in another instruction given may properly be refused.

15. ——: BLANK FORM OF VERDICT. An instruction submitting blank form of verdicts to the jury, from which one is to be selected to return their finding, *held* not to submit to the consideration of the jury a count of the information which by a prior instruction was withdrawn from their consideration.

16. ——: ——: MURDER IN FIRST DEGREE: DIFFERENT COUNTS. It is not error or prejudicial to the rights of a defendant in a prosecution for murder in the first degree, where the information contained different counts charging the homicide to have been committed with deliberation and premeditation and also in the perpetration or attempted perpetration of a robbery, to submit to the jury, for their finding, blank forms of general verdicts of guilty or not guilty of the crime charged in the information, and without a form finding not guilty as to one only of the different counts of the information.

17. **Argument:** MISCONDUCT OF COUNSEL. Record examined, and *held*, counsel for the state not guilty of misconduct prejudicial to the rights of the defendant in his argument to the jury.

18. **Evidence:** VERDICT. Evidence examined, and *held* sufficient to support the verdict of the jury.

ERROR from the district court for Dodge county. Tried below before GRIMISON, J. *Affirmed.*

*Enos F. Gray, George L. Loomis* and *H. C. Maynard,* for plaintiff in error:

Section 3 of our Criminal Code clearly requires that the killing be intentional, in order to constitute murder in the first degree in any case. The opening phrase of the section, "If any person shall purposely," applies to and qualifies each of the modes of killing mentioned in the section, the same as the first. Its fair reading is: If any person shall purposely, and of deliberate and premeditated malice, kill another; or, if any person shall purposely while in the perpetration or attempt to perpetrate any rape, arson, robbery or burglary kill another; or, if any person shall purposely by administering poison, or causing the same to be done, kill another, such killing shall be murder in the

first degree. The word "purposely" can not be detached from the other four words of this phrase. We beg to present a grammatical diagram of the section which demonstrates to a certainty the correctness of our position, and negatives the possibility of any other construction being placed thereon without doing violence to the English language.

But this whole question is so ably and exhaustively discussed in *Robbins v. State,* 8 Ohio St., 131, commencing with page 167, that one does not feel able to add anything to what is there said. The decision in *Robbins v. State, supra,* was reaffirmed in *Kain v. State,* 8 Ohio St., 306; *Hagan v. State,* 10 Ohio St., 459, and *Loeffner v. State,* 10 Ohio St., 598.

*Frank N. Prout, Attorney General,* and *Norris Brown, Deputy,* for the state:

It is argued that instruction numbered twelve fails to tell the jury that the killing must be purposely done. We

can not accept such a construction. A fair and reasonable interpretation of the language used is exactly the contrary. The purpose of the defendant is emphasized rather than omitted in this instruction. It is beyond dispute that when a man purposes to rob another by force, the law conclusively presumes that he purposely does what he actually does do in the furtherance of the original design. If he takes life while engaged in robbery or attempted robbery, the law presumes he purposely does it. This instruction does not assume or undertake to define all the elements of murder in the first degree. When it is considered with the other instructions, in which the element of purpose is clearly and repeatedly set forth, it conclusively appears that it could not have misled the jury.

The deliberate purpose to kill can be formed instantaneously. *People v. Williams,* 43 Cal., 344; *Haunstine v. State,* 31 Nebr., 112; *Carleton v. State,* 43 Nebr., 373.

Argued orally by *Loomis,* for plaintiff in error; by *Brown,* for the state.

HOLCOMB, J.

The plaintiff in error, defendant in the trial court, was informed against, jointly with two others, for the killing of one Herman Zahn, the crime charged being murder in the first degree. On a plea of not guilty to the information, the defendant was separately tried before the court and a jury. The trial resulted in a verdict of murder in the first degree; the jury, in their verdict, finding and determining that the death penalty should be inflicted. On the verdict so returned, the court duly pronounced the sentence of death by hanging. The defendant prosecutes error proceeding for the purpose of having reviewed the proceedings had at the trial and to obtain a reversal of such judgment. Several alleged errors are assigned in the petition in error and ably argued by defendant's counsel, to which we shall now direct our attention.

Complaint is made because of certain rulings made by the trial court while impaneling a jury, whereby several

jurors, after their voir-dire examination, were excused on the challenge of counsel for the state because of the opinions and scruples entertained by them as to the infliction of capital punishment in cases where murder in the first degree is charged. Our views of the law applicable to the alleged error will appear more clearly by a. consideration of the examination of two of the jurors thus excused, although the objection applies to the court's ruling in. excusing more than that number. One Milgrim was called in the jury-box, and, in the examination which followed as to his qualifications to sit as a juror, was asked: "Have you got any such opinion upon the question of capital punishment which would or might preclude you from rendering a verdict of guilty where the punishment for the offense is death; that is, in a case where the evidence was strong and convincing in its character?" To which question he answered: "Yes, sir; I don't believe in capital punishment." Whereupon he was challenged by the state for cause. Defendant's attorney then interrogated the juror, to which replies were made as follows:

Q. Mr. Milgrim, in case you did not understand the question that was just asked you by attorney Stinson upon the question of capital punishment, which I don't believe you did, I therefore desire to inquire of you further on that point. Now, then, if you are finally selected as a juror in this case, and after hearing all the evidence in the case and after hearing the instructions of the court laying down the law in the case, would you then have any such feeling, opinion or prejudice against the death penalty, which would or might preclude you absolutely, and in any and every case, no matter how strong and convincing the evidence might be, from agreeing to a verdict where the penalty for the offense was death?

A. If the evidence would show such, I would have to abide by the law.

Q. Then, if the case was a strong one against the defendant, your opinion upon the question of capital punishment would not preclude you from agreeing to a verdict where the punishment for the offense was death?

A. No, sir; it would not.

Defendant then objected to the state's challenge being sustained, which was overruled and the juror excused, to which ruling exceptions were taken.

Another proposed juror, Brazda, was interrogated regarding the same matter as follows:

Q. Have you any conscientious scruples, or are you conscious of any scruples, upon the question of capital punishment?

A. Yes, sir; I am.

Q. That is, you have such opinion upon the question of capital punishment that would preclude you from rendering a verdict of guilty where the punishment for the offense was death?

A. Yes, sir; I have.

Whereupon a challenge was interposed on behalf of the state for cause.

Defendant's counsel examined the juror, as follows:

Q. Mr. Brazda, do I understand you that you have conscientious scruples in relation to inflicting the death penalty? On that point, this is what I want to know: Take it in a case where one is charged with murder in the first degree, the evidence being sufficiently strong to show beyond any reasonable doubt that the person so charged was guilty, there being no excusing, mitigating or extenuating circumstances surrounding the commission of the offense. Now, then, in such a case are your conscientious scruples of such a character that would prevent you from rendering a verdict of guilty and imposing the death penalty?

A. It would depend upon the evidence.

Q. Then, if it was a clear case upon the evidence, such as I have just mentioned, would your conscientious scruples prevent you from agreeing to a verdict where the penalty would be fixed at death?

A. To an extent, it would depend upon the evidence.

Q. Suppose we were trying a case where the charge was murder in the first degree; the evidence was clear and convincing; that the party charged was guilty beyond reason-

able doubt; the .evidence showed no excusing circum-
stances; no excuse whatever to mitigate the gravity of the
crime charged; so that, to that extent, you are entirely sat-
isfied from the evidence that the accused is guilty as
charged. Now, then, have you any conscientious scruples
that in such a case would prevent you from agreeing to a
verdict which would fix the penalty at death?

A. No, sir; not in that case.

The state then reexamined the juror, as follows:

Q. Mr. Brazda, the court will instruct you that, if you
find the defendant guilty of murder in the first degree, then
it will be your duty, if selected as a juror, to fix the pun-
ishment either at death or imprisonment in the peniten-
tiary during life. Now, are your conscientious scruples
such that you would not fix the penalty at death in any
case, no matter how strong, conclusive and absolute the
evidence might be?

A. It would depend upon the amount of evidence fur-
nished.

Q. Mr. Brazda, the law of this state makes it the duty of
the jury, where a person is found guilty of murder in the
first degree, to either fix the punishment at death, or im-
prisonment in the penitentiary for life. Now, then, are
your opinions upon the question of capital punishment
such that would or might preclude you from rendering a
verdict of guilty where the punishment for the offense
would be death?

A. I think they are.——

After some further questions the state's challenge was
sustained, and the juror excused, over the objection of the
defendant. The examination of the two jurors above given
is as favorable to the defendant, touching the question un-
der consideration, as may be found in the entire record.
Was the court's ruling in excusing the jurors on the state's
challenge for cause erroneous? It is contended by counsel
for defendant that the jurors are competent to sit in the
case, notwithstanding the conscientious scruples which
they entertain regarding the infliction of capital punish-

ment; that, the statute relating to the subject being criminal, it must be strictly construed and can not be expanded by construction; that it is restrictive in its nature and operation, and forbids the rejection of a juror for this cause unless he falls fully and fairly within the language of the statute, which it is argued the jurors who were excused did not. Of the different grounds of challenge for cause declared by statute, one is, in indictments for an offense the punishment whereof is capital, that the opinions of a juror are such as to preclude him from finding the accused guilty of an offense punishable with death. Criminal Code, sec. 468, subdiv. 3. The amendment of section 3 of the Criminal Code in 1893, defining murder in the first degree, authorizing and permitting a jury to determine whether upon conviction the accused shall suffer the death penalty or be imprisoned in the penitentiary during life, does not have the effect of repealing or in anywise affecting the law with reference to the qualifications of jurors in prosecutions for offenses where the penalty may be death. This question has already been decided, and should not, we hold, require of us a reexamination or further consideration. *Hill v. State,* 42 Nebr., 503; *Dinsmore v. State,* 61 Nebr., 418. The spirit of the law at present is that in prosecutions for murder in the first degree, in all proper cases where guilt is established, the punishment may and should be capital. It is for the jury, in their discretion, to say which of the two methods of punishment mentioned—death or life imprisonment—shall be imposed. It is manifestly the legislative intent that capital punishment should not be withheld because of scruples against its infliction, but, rather, if not imposed where a verdict of guilty of murder in the first degree is returned, because of the circumstances attending the commission of the crime, rendering the other of the two modes of punishment the more appropriate. The reason for the rule as to a juror's qualification exists with the amended statute as to punisment as it did before its adoption. Capital punishment is yet recognized as a just and merited punishment for the commission of

the crime of murder, to be inflicted when proper to best conserve the interest of society, protect the people in the security of their persons, enforce the laws and administer justice. If the extreme punishment should be inflicted in any case, then it becomes necessary, in all prosecutions where a capital offense is charged, to have a jury who have no such scruples against its infliction as would preclude them from carrying into execution the law according to its letter and spirit. To follow and uphold the law, rather than to be guided by opinions and scruples entertained as to the policy of the law providing for such punishment, is the purpose of excluding jurors whose opinions alone on the subject would probably preclude them from returning a verdict fixing the extreme penalty. A proper construction of the provision we are dealing with does not, in our judgment, require that, in order to render a juror incompetent, his opinions and scruples must be such as to absolutely forbid him, under any circumstance and under any state of the evidence, from rendering a verdict inflicting the death penalty. A fair interpretation of the statute is that when a juror entertains opinions or conscientious scruples against imposing the death penalty, such as will bias his judgment, influence him in the consideration of the evidence and hinder or retard him in arriving at such a verdict if the evidence warrants it, then the cause for challenge contemplated by the statute exists, and it is not error to sustain a challenge for cause by reason of the opinions or scruples so entertained by a juror. The jurors who were excused came, we think, fairly within the purview of the statute, and it was proper to sustain the state's challenge, on that account. In *Dinsmore v. State*, 61 Nebr., 418, it is stated in the twenty-third paragraph of the syllabus that "the entertaining of conscientious scruples against capital punishment is a ground for challenge for cause in a prosecution for murder in the first degree, and it is competent to interrogate a venireman upon that subject." Says Chief Justice NORVAL in the opinion of the court (p. 434): "Two other jurors were also asked by the state, on

Rhea v. State.

their voir-dire examination, if they had any objections or conscientious scruples against the infliction of capital punishment if the evidence warranted it. It is urged that the question was improper, because it tended to exclude from the jury any one who might lean towards the infliction of a lesser penalty. This court has decided adversely to defendant's contention in *Hill v. State*, 42 Nebr., 503, and no substantial reason is advanced for receding from the position there announced. The entertaining of conscientious scruples against the infliction of the death penalty is ground for challenge for cause under section 468 of the Criminal Code; hence it follows that it is proper to interrogate a venireman on that subject." In *Sawyer v. State*, 47 S. W. Rep. [Tex. Cr. App.], 650, it is stated in the headnotes: "In a prosecution for rape, a juror stated on his voir dire that he had conscientious scruples in regard to inflicting the death penalty except in extreme cases of murder in the first degree. He further stated that he did not know whether he had conscientious scruples as to the death penalty in rape cases. Held, that it was not error to excuse the juror on the state's challenge." Says the court in the opinion, in speaking on this point: "If the juror has conscientious scruples in regard to the infliction of the death penalty, the state has the right to challenge him for cause in a case where a capital crime is under investigation. If this were not true, the state would be compelled to take jurors in capital cases who had conscientious scruples in regard to inflicting the death penalty, unless the defendant saw proper to exercise his challenge for such cause. This is not the intention or meaning of the law. The rights of the parties are largely the same with reference to challenges for cause. If the defendant alone had the right to challenge on this ground, then this construction of the law would render inoperative the punishment of death for crime in Texas. It would be a rare instance in which the defendant would excuse a man who had conscientious scruples in regard to the infliction of the death penalty, when he was on trial for a capital offense.

It is the duty of the state to furnish a juror qualified to sit in the trial of the case. If the juror himself on his voir dire leaves his qualification in doubt, the court can not be certain that he is a qualified juror; and in such case, when the challenge is made by either party (when both have the equal right to challenge), it may be the duty of the court to excuse the juror." Another case illustrative of the rule is *State v. Bauerle,* 46 S. W. Rep. [Mo.], 609, where it is held that "where a juror upon his voir dire stated that he was opposed to capital punishment on circumstantial evidence, and, on being asked, if the evidence convinced him of defendant's guilt beyond a reasonable doubt, whether he could, or would not, convict, answered, 'I believe I could, but I would have to admit it would take a great deal of it, and would have to be very strong,' it is not error to excuse him." The opinion of the court fairly sustains the point stated in the paragraph of the syllabus we have quoted. See, also, *People v. Tanner,* 2 Cal., 257; *Martin v. State,* 16 Ohio, 364; *Driskill v. State,* 7 Ind., 338; *People v. Damon,* 13 Wend. [N. Y.], 351; 1 Bishop, New Criminal Procedure [3d ed.], sec. 918, and authorities there cited.

An examination of the authorities to which our attention is called by defendant's counsel in support of their contention regarding the subject reveals no very material or irreconcilable conflict of the authorities on the question. *Atkins v. State,* 16 Ark., 568, was reversed on the ruling of the trial court that, if a juror answered that "he was opposed to capital punishment," he was disqualified. Mere opposition to capital punishment may not be, and probably is not, a disqualification, within the meaning of the statute. A juror, notwithstanding he is opposed to capital punishment, may be entirely free to decide a case according to the law as it is and the evidence. The same, in effect, is the ruling of the supreme court of California in *People v. Stewart,* 7 Cal., 140, where a distinction is made between opposition to capital punishment on principle and conscientious scruples to its infliction; and under the statute of that state it was held that, because a person was opposed

to capital punishment on principle, he was not disqualified to sit as a juror in a case where capital punishment might be inflicted. In *Stratton v. People*, 5 Colo., 276, it is held that conscientious scruples against inflicting the death penalty do not necessarily disqualify a juror. If, notwithstanding such scruples, he will render a verdict in accordance with law and evidence, and his answers on this point leave no uncertainty, it is all the law requires. In *Williams v. State*, 32 Miss., 389, whether or not the conscientious scruples entertained by a juror would bias his judgment in the consideration of the case is made the test by which his competency is to be determined.

After all that has been or may be said on the subject, the proposition, when resolved to its simplest terms, is whether a juror, by reason of his fixed opinions and conscientious scruples against the imposition of the death penalty in capital cases, is biased in his judgment to an extent that would interfere with and influence him in the consideration of the evidence under the law as existing; whether his opinions and scruples are at war with the law, so as to warp his judgment and control his actions as a juror; whether he stands indifferent as between the state and the accused, and can render such a verdict as is justified by an unbiased and dispassionate consideration of the facts when applied to the law by which the accused is tried. The jurors in the case at bar, whose examination as to their opinions regarding the imposition of the death penalty which we have heretofore noted, show a marked disposition to allow their opinions and scruples to influence them in the consideration of the case with reference to the claims of the prosecution that the case was one where the extreme penalty known to the law should be meted out to the accused. While their answers in the examination, under the skillful questioning of learned counsel, may not be altogether consistent, and in some instances fairly conflicting with each other, consideration of the whole thereof leads one quite strongly to the conclusion that their convictions on the subject being investigated were such as to rationally and

naturally enter into their consideration of the case, and
militate strongly against the state in asking for the impo-
sition of the death penalty on a verdict of guilty of the
highest crime charged in the information.  They were not
unbiased and indifferent regarding the matter, and appar-
ently entertained opinions that would influence their de-
cision against the law and the evidence.

But, in another view of the matter, we are constrained
to hold that the ruling of the trial is not reversible error.
Viewing the subject in the most favorable light toward the
defendant that it is susceptible of, and conceding that it
would not have been erroneous, as to the prosecution, to
overrule the state's challenge to these jurors for cause, as
was done in the case of *People v. Wilson*, 3 Parker's Crim.
Rep. [N. Y.], 199, cited by defendant, and yet it does not
follow that error was committed in excusing the jurors on
such challenge.  At best, there must exist doubts of the
gravest character as to the qualifications of the jurors who
were excused.  It can not be said there is no uncertainty as
to whether they would be guided solely by the law and the
evidence.  Their qualification or disqualification can not
be demonstrated with perfect exactness.  A discretion or
latitude is, and the law wisely says, should be, given the
trial court regarding such matters.  And this discretion
is greater when exercised in excusing jurors from serving
in a trial where their qualifications are in grave doubt
than in their retention.  In the latter case, if it be deter-
mined that a juror was disqualified, and yet he is retained,
it results in substantial prejudice to one of the parties liti-
gant.  This rule is founded in wisdom and the necessities
of the case.  Its tendency in all cases is to secure a trial
jury altogether unbiased and entirely qualified to try the
issues of fact.  It comes nearest in securing a jury measur-
ing up to the ideal of perfection.  If a substantial doubt
arises or there is uncertainty as to the qualifications of a
proposed juror, from his voir-dire examination,—a doubt
having a reason for its basis and regarding a question
which the juror shows indecision and uncertainty,—can it

be said, because such a juror is excused, that an error has been committed, affecting the substantial rights of one of the parties, for which a cause must be reversed and a new trial had? The trial court was required to pass upon the jurors' qualifications in the light of their entire examination as to their qualifications. The jurors were before the court. Their answers, as given, and their manner of giving them, were heard and observed by the presiding judge. He was in a position to note their demeanor, their action, the intonations of their voice as questions were answered, the hesitancy or promptness with which answers were given, the positiveness or lack thereof in the answers given, and from such examination very properly reach a conclusion altogether warranted, which perhaps would not appear so clearly when the record alone of the examination, as preserved, is resorted to for a determination of the question and the correctness of the ruling. It is observed by this court in *Basye v. State,* 45 Nebr., 261, 278: "Manifestly, it is the duty of the trial court to decide as to the fact of qualification of the person challenged from a consideration of his entire examination and such other evidence and circumstances as tend to throw light upon the subject. The trial court in determining the fact of qualification is not confined to the answers of the juror alone, but may consider his appearance and general demeanor while undergoing examination." And it is held: "The finding of the trial court in deciding a challenge for cause will not be set aside by the appellate court unless it is clearly wrong." Says the supreme court of Missouri, on this phase of the subject, in *State v. Bauerle, supra:* "Upon this showing the court excused him. This juror was in the presence of the court. It observed his manner, and probably, living in the same county, he was known to the judge, and a wise discretion was necessarily lodged with the judge in excusing him. Whether the juror stood indifferent between the state and the defendant was a fact which the court, under our laws, was required to determine, and his finding will not be disturbed unless manifest error appears." In *State*

*v. Miller,* 29 Kan., 43, it is said: "A trial court in impanel-
ing a jury to serve in a particular case should have and has
a very extensive and almost unlimited discretion in dis-
charging a person called to serve on the jury, who might,
in the opinion of the court, not make the fittest or most
competent person to serve on that jury. But this rule
should not be applied in retaining jurors." The rule
stated in the case last cited was quoted approvingly and
followed in *Richards v. State,* 36 Nebr., 17, 19, wherein
will be found a discussion of the subject, and a number of
other authorities to support the proposition. It follows
that the defendant's contention that error was committed
by the trial court's ruling on the state's challenges for
cause to the several jurors excused because of their opin-
ions regarding the infliction of capital punishment is not
well founded.

An exception was taken by the defendant to the twelfth
instruction given the jury by the court on its own motion,
and the giving thereof is now assigned as error. The in-
struction is as follows: "If you believe from the evidence,
beyond a reasonable doubt, that at the time of the alleged
killing the defendant had entered the saloon of the said
Herman Zahn for the purpose of feloniously and violently
taking the money or personal property of said Herman
Zahn from his person by force, intimidation or by putting
said deceased, Herman Zahn, in fear, and that in the prose-
cution of that purpose the defendant shot the deceased, and
thereby caused his death, then such killing under such cir-
cumstances would be murder in the first degree. In other
words, if from the evidence the jury believe beyond a rea-
sonable doubt that the defendant killed said Herman Zahn,
and also at the time of the killing that the defendant was
engaged in an attempt to perpetrate a robbery upon the
person of the said deceased, then the defendant would be
guilty of murder in the first degree." It is strenuously
urged by counsel for defendant that the instruction quoted
above is erroneous, and especially the latter part thereof,
beginning with "in other words," is fatally defective, be-

cause therefrom is eliminated the element of purpose or intent to do the killing charged, which it is insisted is an essential ingredient of the crime of murder in the first degree, when a homicide is committed in the perpetration or attempt to perpetrate a robbery on the person of the deceased. The alleged error and the argument in support thereof are predicated on the propositions: First, that a proper construction of the language used, as found in section 3 of the Criminal Code, defining murder in the first degree, necessitates the conclusion that if a person is killed by one engaged in the perpetration of a robbery, or attempt to perpetrate that act, the killing must be intentional, or purposely done, and that an unintentional killing while perpetrating or attempting to perpetrate either of the felonies mentioned in the section would not constitute murder in the first degree, but, at most, only manslaughter; and, secondly, that section 3 of the Criminal Code was adopted by the legislature of Nebraska from a similar section of the Criminal Code of Ohio, which at the time of its adoption had received a judicial construction by the court of last resort of that state, and therefore, applying the ordinary rule of construction as to such adopted statutes, it is to be presumed that the legislature of this state adopted with the act the construction then placed upon it by the Ohio supreme court, and that this court is bound by such construction. The construction contended for had been given the Ohio act prior to its adoption by this state, and it should, we think, be said that our legislature adopted in all its essential features the section as it existed in the Ohio Code, although, as will hereafter be noted, the two enactments are not identical in all respects; the difference, in the main, being an additional method by which murder in the first degree might be committed, to that contained in the Ohio act. The two questions thus presented should perhaps be regarded as no longer open for discussion in this jurisdiction, in view of the unequivocal decision thereon in the case of *Morgan v. State,* 51 Nebr., 672, where it is held: "Homicide committed in the perpetration

or attempt to perpetrate any rape, arson, robbery, or burglary is by section 3, Criminal Code, declared murder in the first degree. The turpitude of the act is, in the exceptional cases mentioned in the statute, made to supply the place of deliberate and premeditated malice, while a purpose to kill is conclusively presumed from the intention which is the essence of the enumerated felonies." It is also held in the same case that the construction given to the section in the Ohio Code by the court of that state, and from which ours appears to have been adopted, was not of such binding force as to require this court to follow it, by the application of the rule of construction ordinarily applied to adopted statutes which have received judicial construction by the courts of the state from which adopted, prior to adoption. In view of the importance of the questions involved, and the serious consequences flowing from their determination adverse to defendant's contention, we have deemed it proper to again consider the matter briefly, and perhaps add something worthy of consideration to what is said in the opinion in *Morgan v. State, supra.*

In support of the contention first mentioned, it is argued that a correct grammatical construction of the statute, which, by way of illustration, counsel present in the form of a grammatical diagram, would, under a correct reading of the necessary parts of the section to the case at bar, be as follows: "Every person shall be deemed guilty of murder in [the] first degree if [such] person shall kill another person purposely in the perpetration of [a] robbery." Or, stated in another way, and in the usual arrangement of words, it is said that a fair reading of the section, so far as applicable, would be, "If any person shall purposely, while in the perpetration or attempt to perpetrate a robbery, kill another, every such person so offending shall be deemed guilty," etc.; that the word "purposely" qualifies each of the different modes of killing mentioned in the section; and *Robbins v. State,* 8 Ohio St., 131, is cited in support of this contention. But to us it appears that a fair reading of the statute, and a natural and rational construction,

giving to the language used its ordinary and commonly accepted meaning, and thus carrying into effect what may be regarded as the will, purpose and object of the legislature, and following the clear and decided weight of authority as to the underlying principles upon which it may be presumed the legislature acted with reference thereto, require a different construction. The argument in support of the construction contended for is based almost exclusively on a strict grammatical construction, which sacrifices substance to form, and, when relied on solely, is an unsafe guide to follow. It is technical in the extreme, and, if adopted as a rule of construction, would in many instances defeat, rather than give effect to, the legislative will. Nor are we ready to concede that a strict grammatical construction of the section necessarily leads to the conclusion insisted on, as we will note more fully hereafter.

The generally accepted construction of the language used in section 3 or similarly worded statutes enacted by legislatures in defining murder in the first degree, is that the purpose or intention to kill, when the slayer is engaged in the perpetration of, or attempt to perpetrate, one of the enumerated felonies, will be conclusively presumed from the felonious intention characterizing the act he is engaged in, and he is held responsible for all the consequences flowing from his felonious acts. The statute would read, when each of the two classes or different methods of killing is stated separately, as follows: "If any person shall purposely and of deliberate and premeditated malice kill another; or if any person shall in the perpetration or attempt to perpetrate either a rape, arson, robbery or burglary or by administering poison or causing the same to be done kill another, every person so offending shall be deemed guilty of murder in the first degree." Or by omitting all the language not applicable to the offense charged in the case at bar, pertaining to the question being considered, the section would read: "If any person shall * * * in the perpetration or attempt to perpetrate any * * * robbery, * * * kill another; * * * every person so

offending shall be deemed guilty of murder in the first degree," *Morgan v. State, supra; Moynihan v. State,* 70 Ind., 126; *Oregon v. Brown,* 7 Ore., 186; *Commonwealth v. Manfredi,* 162 Pa. St., 144; *People v. Mooney,* 2 Idaho, 23; *State v. Miller,* 100 Mo., 606; *Reddick v. Commonwealth,* 33 S. W. Rep. [Ky.], 416; *State v. Gray,* 19 Nev., 212; *People v. Nichol,* 34 Cal., 211. It is argued that the word "purposely" is meaningless if applied only to a killing committed with premeditation and deliberation, and yet further on in counsel's brief complaint is made because it is claimed the jury were not told, in defining murder in the first degree under the first mode mentioned in the section, that the act producing death must have been performed in pursuance of the previously formed purpose to kill; and it is doubtless true there must not only be a purpose to kill, regarding which there has been premeditation and deliberation, but also that the act resulting in death must have been caused or brought about in pursuance of the previously formed purpose and design to kill. The word, therefore, fills an important office, and describes an essential ingredient of murder in the first degree, committed with deliberation and premeditation. It is also insisted that section 5, defining manslaughter, covers and includes an unintentional killing while a person is engaged in any unlawful act, whether one of the felonies mentioned or otherwise, and that to construe the section under consideration as including an unintentional killing, as constituting murder in the first degree, is in conflict with that section. We regard it otherwise. That section provides generally that an unintentional killing without malice, while the slayer is in the commission of an unlawful act, shall constitute the crime of manslaughter. By the common law every homicide committed in the perpetration of a felony was murder, and this whether there was any precedent intention of doing the homicidal act or not. 1 Hale P. C., 465; 1 East P. C., 255; 1 Hawkins P. C., 112, ch. 29, sec. 11; 4 Cooley, Blackstone Commentaries, 200, 201. The legislature, because of the more enlightened age and humane

trend in providing for the administration of the criminal law, has restricted the crime of murder, when a homicide is committed intentionally or unintentionally, while the slayer is engaged in a felonious act, to the few felonies enumerated, which are, for baseness and depravity, of the most flagrant character, and where the wickedness of heart and mind is of the most pronounced type. Because of the felonious intent and moral turpitude actuating the transgressor, the law transfers the wrong intent and purpose from the one to the other, and holds the slayer bound by and responsible for the consequences flowing from the felonious act engaged in. In all other felonies where an unintentionl homicide is committed while the slayer is engaged in the unlawful act, the legislature, in its wisdom, has said the offense should be reduced in degree from what it was at common law to that of manslaughter. Such a construction appears to us rational, in consonance with the development of criminal jurisprudence, and supported by the clear weight and trend of modern judicial decisions. See *Moynihan v. State,* and other authorities cited, *supra; State v. Hopkirk,* 84 Mo., 278; *People v. Vasquez,* 49 Cal., 560; *Titus v. State,* 49 N. J. Law, 36; *Buel v. People,* 78 N. Y., 492; *People v. Greenwall,* 115 N. Y., 520.

As to the second question involved in the proposition under discussion, it is argued that because of the adoption of section 3 by the legislature of this state from a like section of the criminal Code of the state of Ohio, which at the time of its adoption had been construed by the supreme court of that state to mean that the killing in the perpetration of either of the felonies therein mentioned, in order to constitute murder in the first degree, must have been purposely done, it is therefore conclusively presumed that the legislature of this state adopted with the statute such construction, and that the court is bound to give the section the same construction as though the legislature had in direct language expressed itself that a homicide committed in the perpetration or attempt to perpetrate either of the felonies

35

mentioned must be intentionally done, in order to consti-
tute murder in the first degree. As heretofore stated, this
particular phase of the question also received consideration
and attention in the case of *Morgan v. State, supra;* and it
was there held that this court was not absolutely bound by
the construction placed upon the statute by the Ohio su-
preme court and refused to follow that construction, be-
cause they believed it to be unsatisfactory in reasoning, un-
sound in principle and against the overwhelming weight
of authority. The rule which generally obtains regarding
the effect of a prior construction of the adopted statute
doubtless is that, when the legislature of this state adopts
such statute, the judicial construction which it has already
received in such state is also adopted. *Myers v. McGavock,*
39 Nebr., 843, 847; *Coffield v. State,* 44 Nebr., 417; *For-
rester v. Kearney Nat. Bank,* 49 Nebr., 655. If the rule
mentioned is an unvarying one, and applies, without ex-
ception, alike to all adopted statutes which have been
judicially construed prior to adoption, the conclusion
reached in the *Morgan Case* can not be upheld, and, what-
ever may be our views as to a proper construction of this
statute, we are unalterably bound by the construction
given by the Ohio supreme court, which ordinarily it is
presumed the legislature intended should prevail when it
adopted the section under consideration. It is, we think,
commonly understood and the generally accepted belief,
that our Criminal Code, as enacted in 1873, was largely
borrowed from the Code of Ohio; and while other statutes
of different states were in substance the same, and the
underlying reason and principles involved in a proper con-
struction applicable alike to all, yet the phraseology of our
statute makes it manifest that it was borrowed from Ohio,
rather than from any other of the different commonwealths
having substantially the same enactments. The Ohio
statute provides "that if any person shall purposely, and
of deliberate and premeditated malice, or in the perpetra-
tion, or attempt to perpetrate any rape, arson, robbery, or
burglary, or by administering poison, or causing the same

to be done, kill another; every such person shall be deemed guilty of murder in the first degree; and, upon conviction thereof, shall suffer death." Our statute of 1873 was not, as will be observed, identical in all respects with that of Ohio, heretofore quoted. It reads as follows: "If any person shall purposely, and of deliberate and premeditated malice, or in the perpetration, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done, kill another; or, if any person, by willful and corrupt perjury, or by subornation of the same, shall purposely procure the conviction and execution of an innocent person; every person so offending shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall suffer death." General Statutes, 1873, p. 720, ch. 2, sec. 3. While our statute is in the main the same as the one copied from Ohio, there is a basis for the contention that, because of the difference of the wording of the two statutes, the presumption does not necessarily follow that our legislature also adopted the construction put upon the Ohio statute by the supreme court of that state. It may be argued that the fair and rational interpretation to be given to our statute and the legislative intendment as first enacted is that, to constitute murder in the first degree, there must, as first stated, be a killing purposely and with premeditation and deliberation, or, as last stated, the procurement of the conviction and execution of a person by perjury or subornation of perjury, purposely, willfully and corruptly, or, by the other modes named, the killing of another in the perpetration or attempted perpetration of either of the felonies therein enumerated, without regard to the purpose or intention of the actor. It is entirely clear that in the first instance mentioned in the section the killing must be intentional, and that the same is equally true in the instance last mentioned. As to the other class of murders mentioned in the section, there may be, and probably is, an uncertainty, justifying a rational difference of opinion as to a proper construction of the language used and the intent of the legislature,

requiring a judicial construction as to the meaning of the language used, and the legislative will when it enacted the statute. In *Robbins v. State, supra* [8 Ohio St., 131], it is held that the purpose to kill, as expressed in the statute, applies to the several classes of murder in the first degree therein mentioned, and that such interpretation results from a fair grammatical construction of the language used, and also from its reasonableness and consistency with the spirit of the laws of that state, as well as the context of the section in conjunction with other sections of the statute. It is made manifest by a reading of the majority opinion in that case that in a large measure the construction given arose from an attempt to adhere to a strict grammatical construction of the language used, the arrangement of the words, and especially the manner of punctuation. It is said by the author of the opinion (p. 175) : "This section is composed of one compound sentence, and is descriptive of three classes of homicide, to wit: First, that which is committed of deliberate and premeditated malice; second, that committed while in the perpetration, or attempt to perpetrate a rape, arson, robbery, or burglary; and third, that committed by administering poison, or causing the same to be done. The first clause, or distinct subdivision of the sentence, according to the punctuation, consists of the words, 'That if any person shall purposely.' And the question is, whether this preceding phrase 'purposely,' which qualifies the word 'kill,' in the latter part of the sentence, applies to each of the three several classes of homicide mentioned in the intermediate clauses of the sentence, or whether it is limited to the first class. The word 'purposely' is, by the authoritative punctuation of the statute, in a clause of the sentence distinct from that which makes 'deliberate and premeditated malice' a distinguishing feature in the first class of homicide mentioned; and it is the adverb qualifying the verb 'kill,' which constitutes the predicate of the subject of each of the several intervening clauses of the sentence. Now, it appears to be a rule of syntax that, where an

antecedent adverb in the first clause qualifies a verb in the closing part of the sentence, forming the predicate of the subject of several distinct intermediate clauses of the sentence, such qualification of the predicate applies to the subject of each of such intervening clauses, unless some word or words are used expressly limiting it to a part. * * * Taking the language of the statute, therefore, according to its proper and grammatical signification, the word 'purposely,' which is expressive of the intention of the party, and qualifies the verb, which is the predicate of the several clauses preceding it, not being expressly restrained or limited in its operation, applies to each of the three classes of homicide specified in the sentence. The words of the section, therefore, taken in their proper signification, and according to their grammatical construction, make a purpose to kill an essential ingredient in each of the several classes of the crime of murder in the first degree, as defined by the statute."

In view of what has been said, we now turn to our own statute, as amended in 1893, wherein it is provided that the jury, in its discretion, may determine whether the death penalty shall be inflicted or the accused be imprisoned in the penitentiary for life, on conviction of murder in the first degree. The comma after the word "purposely," which is found in the original section and in the Ohio statute, has been omitted, so that the section now reads: "If any person shall purposely and of deliberate and premeditated malice, or in the perpetration or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done, kill another;" etc. Session Laws, 1893, p. 385, ch. 44. It is true that in the compilation of the statutes after the passage of the amended section a comma appears, as in the original section, after the word "purposely"; but an inspection of the enrolled bill as approved by the governor shows this to be an error of the compiler. The change, though small, is not without significance. At every session of the legislature there are a number of lawyers in both branches of learning,

ability and experience,—those who are familiar with the trend of judicial decisions and the rules of statutory construction. A purpose to alter the section by amendment, and thereby avoid the force of the rule contended for by reason of the prior judicial interpretation by the supreme court of Ohio, when this state adopted this section of the statute, is inferable, because the modification is regarding a point on which, in a marked degree, that decision rested. It is probable that no general amendment of the law defining murder in the first degree was deemed wise, nor any amendment, save as to punishment, deemed advisable. The fact that the construction given the statute of Ohio by the courts of that state stands conspicuously alone among the many adjudications on the subject, and the fact that the statute of that state has been repealed, and a new one enacted, substantially different, justify us in refusing to follow the view expressed in the decision referred to, unless irrevocably bound by the rule invoked as to the adoption of the judicial construction placed upon the statute at the time of its adoption into the Code of this state. The rule is not an unvarying and inflexible one. It is not a conclusive presumption to be applied in all cases. It has its proper limitations and exceptions, and when a statute which has received a judicial construction is amended in respect of a matter and on a point regarding which such prior construction in a large measure rests, the reason for the rule fails, and with it the rule itself ceases in its application. For the same reason the rule does not apply with full force when the adopted statute is not in all respects, or in its scope and effect, similar to the statute of the state from which adopted, although in its main features the same. We conclude, therefore, that by the incorporation into the statutes of this state of the statute of Ohio which defines the crime of murder in the first degree, in so far as it has been adopted, and with the amendments made thereto by the legislature of this state, it does not necessarily follow, nor is it conclusively presumed, that the construction placed thereon by the courts of Ohio was

adopted with the act by the legislature of this state, and that this court, under the circumstances, and in view of the subsequent legislation, is justified in adhering to the rule announced in *Morgan v. State, supra,* and that on principle, and in harmony with the great weight of judicial authority as to the proper construction of such statutes, we hold that the purpose to kill is not an essential ingredient when a homicide is committed in the perpetration or attempt to perpetrate, one of the enumerated felonies in said section mentioned. In *Coulam v. Doull,* 9 Pac. Rep. [Utah], 568, it is held: "The incorporation into the laws of Utah of a statute of another state does not necessarily carry with it the adoption of the construction of the courts of the latter state upon such statute." Says the author of the opinion: "But it is argued that we took the section of the statute under consideration from California, and that it has received a different construction in that state, and that our legislature must be presumed to have adopted the statute with the construction put upon it by the courts of California. This rule is not absolute. *Cathcart v. Robinson,* 5 Pet. [U. S.], 265. The statute, as we have seen, was construed by Massachusetts and Iowa before it was adopted in California, and the California decision seems to us to be opposed to the weight of authority, and of sound reason, and to be a departure from the prevailing interpretation." The rule there announced was in the same case affirmed by the supreme court of the United States. *Coulam v. Doull,* 133 U. S., 216. To the same effect are: *Whitney v. Fox,* 166 U. S., 637; *Cathcart v. Robinson,* 5 Pet. [U. S.], 264; *Jamison v. Burton,* 43 Ia., 282; *Oleson v. Wilson,* 52 Pac. Rep. [Mont.], 372. The instruction complained of, we hold, states the law correctly, and that error can not be successfully predicated on its being given to the jury.

Another instruction given the jury is excepted to by the defendant, which appears to be a verbatim restatement of the one given in the trial of the case, and sustained by this court, in *Carlton v. State,* 43 Nebr., 373. The same al-

leged error was therein considered, and decided adversely to the contention that it was prejudicially erroneous. The question was again before the court, on substantially the same instruction, in *Savary v. State,* 62 Nebr., 166, and the instruction upheld. While the instruction could probably be improved some in its phraseology, and thus avoid any possible ground of criticism, when considered as a whole the law is correctly stated, and it should not be condemned for an imperfection so slight and unsubstantial. The ruling on the soundness of the instruction and the reasons therefor given in the *Carleton Case* are deemed amply sufficient to sustain the one in the case at bar. That part of the instruction wherein it is said: "If a person has actually formed the purpose maliciously to kill, and has deliberated and premeditated upon it before he performs the act, and then performs it, he is guilty of murder in the first degree," is criticised because it is not stated that the act must be done in pursuance of the previously formed design. But it is stated in the first part of the instruction —and the whole instruction must be considered and construed with reference to all its parts—that the act must be performed in furtherance of the design or purpose previously formed. And in the portion of the instruction objected to the only reasonable and natural conclusion to be reached by a reading thereof is that after the act has been conceived, thought of, weighed and considered and then performed,—that is, the same contemplated act, upon which the deliberation and premeditation has been had, carried into execution,—this would be murder in the first degree. When taken in connection with the facts in the case as disclosed by the evidence, the instruction is susceptible of no other rational view. We do not think the portion of the instruction excepted to is fairly subject to the criticism offered.

Complaint is made because of the trial court's refusal to give the following instruction requested by the defendant: "The court instructs you that proof of robbery after the shooting of Herman Zahn is not proof that the accused,

William Rhea, intended to rob him at the time of such shooting. If the shooting occurred as an incident of an angry dispute or altercation between others, in which the accused, William Rhea, became embroiled, and the said accused simply did the shooting under the excitement incident to such broil, and without any purpose to rob up to that time, but after the shooting formed the purpose to rob, then the accused would not be within the requirement of those words; and, unless the evidence satisfies you beyond a reasonable doubt—that is to say, to a moral certainty—that the accused actually had the purpose or intention to rob at the time of the shooting, in the sense above in this instruction mentioned, then, under the requirement of said words in said section 3 of our Criminal Code, you have no right to find the said accused guilty of murder in the first degree." That portion of the instruction referring to the shooting as being incident to an angry dispute or altercation between others, in which the accused became embroiled, is not, in our judgment, based on any evidence in the case, and has no foundation for its existence. We find nothing disclosed by the bill of exceptions to give color to the theory that the accused became embroiled in an altercation with others, and did the shooting under the excitement incident to such broil. The instruction was, we think, properly refused, because its effect could be only to mislead the jury, and was regarding the possible existence of facts not disclosed by the evidence. In an instruction given the jury by the court, they were advised, in clear and explicit language, that before they could find the defendant guilty of murder in the first degree, while in the perpetration or attempted perpetration of a robbery, they must find "that there should first be the intention to rob, and that the killing should be done as a part of the perpetration or attempted perpetration of such intended robbery," and unless it was found that the accused, at the time of shooting the deceased, "intended to rob him, and that such intention to rob was already formed in the mind of the accused at the time of such shooting,"

the defendant could not be found guilty of murder in the first degree. This instruction fully covered the proposition stated in the refused instruction, save wherein it was inapplicable because not based on any evidence in the case. We perceive no error in the ruling of the court in refusing the instruction of which complaint is made.

The information contained four counts. By the fifth instruction given the jury they were told: "You are instructed that the fourth count of this information does not charge any material allegation as against the defendant on trial, William Rhea, which is not contained in the first three counts; and, for the purpose of this case, you need not pay any attention to the said fourth count." Instruction 22 is as follows: "You will be furnished with five forms of verdicts, as follows: One finding the defendant guilty of murder in the first degree, and fixing the penalty of death; another finding him guilty of murder in the first degree, and fixing the penalty of imprisonment in the penitentiary during life; another finding him guilty of murder in the second degree; another finding him guilty of manslaughter; and another finding him not guilty. From these you will select the one you desire to use, and sign and return the same." It is insisted that the last instruction is in conflict with the fifth instruction, and submitted the offense charged in the fourth count to the jury, and is, therefore, prejudicially erroneous. We are unable to agree with counsel that the latter instruction in anywise affected the former. The fourth count was unqualifiedly withdrawn from the jury, and the instruction complained of was altogether applicable and consistent with a submission of the case on the other three counts; but, even if it did, there could arise no prejudice against the defendant, as the fourth count, as to him, was but a repetition of the same allegations contained in a prior count. It differed from the other count only in that in it another of the defendants informed against jointly with the defendant Rhea was charged as an accessory, and not a principal. The instruction is also complained of because the jury were not

submitted a separate form of verdict finding defendant
Rhea not guilty of the first count in the information.  The
first count charged the defendants with killing the deceased
by shooting, with deliberate and premeditated malice; in
the second count the offense was alleged to have been com-
mitted with deliberate and premeditated malice while in
the perpetration or attempted perpetration of a robbery;
and in the third count the killing was declared to have
been done in the perpetration or attempted perpetration of
a robbery, no deliberate and premeditated malice being
alleged.  The three counts charge that the defendant com-
mitted the homicide charged, with deliberation and pre-
meditation, and in the perpetration or attempted perpe-
tration of a robbery.  The plea of not guilty raised the
issue of fact as to the killing being done either with de-
liberation and premeditation, or while engaged in the per-
petration or attempted perpetration of a robbery.  Each
count charged murder in the first degree, under the provis-
ions of section 3 of the Criminal Code.  Each charged the
offense to have been committed at one and the same time,
and by the same identical acts.  The counts were not in-
consistent with or repugnant to each other.  They did not
vary or differ in any degree or manner, save premeditation
and deliberation was charged in one instance and not in
the other.  There could be but one conviction and one
sentence, or one acquittal, which would completely dis-
pose of all issues raised.  The general verdicts in blank
form submitted to the jury responded to these issues, and
a finding generally of guilty of the charge preferred, or not
guilty, was not, and could not in any manner be prejudicial
to the rights of the defendant.  In *Wilson v. State*, 20
Ohio, 26, it is said: "We think it prudent in the case of
distinct and independent offenses, especially where they
are made so by the statute, and are subjected to different
degrees of punishment, to require the jury, in the absence
of a general verdict, to affirm or negative each charge, in
their finding."  The rule was quoted approvingly and
adopted by this court in *Williams v. State*, 6 Nebr., 334,

and *Casey v. State,* 20 Nebr., 138. In the case at bar the information by the different counts charged but the one offense of murder in the first degree, the counts varying in form only to meet the proofs as to the manner by which the homicide was committed; and a general verdict of guilty as charged responded to the issues raised. The punishment which could be imposed by the verdict returned must be fixed by the jury on the general verdict, and no further prosecution can be had on any of the counts therein contained after final judgment is once rendered. The rule, as we understand the authorities, is that, when the same crime is charged by different counts of an information to have been committed in different ways and by different means, it is for the jury, on the evidence adduced before them, to say whether the defendant is guilty of the offense charged by a general verdict; and this whether committed in the manner and form charged by either of the counts contained in the information. Wharton, Homicide, secs. 819, 906; *State v. Baker,* 63 N. Car., 276; *Buck v. State,* 1 Ohio St., 61; *Wilson v. State, supra; Robbins v. State,* 8 Ohio St., 131; *Boose v. State,* 10 Ohio St., 575; *Adams v. State,* 29 Ohio St., 412; *Commonwealth v. Flanagan,* 7 Watts & Serg. [Pa.], 415, 418.

During the oral argument to the jury by counsel for the state it is claimed one of the attorneys used the following language: "Nothing can restore the once loving hands and kind affections of Herman Zahn to his fatherless little children. All they can do, is to stand at the new made grave and behold the spot where lies their loving parent." Objection to the language was made, to which the court made no ruling. No further objections or criticisms of counsel in arguing the case appear. The language certainly does not amount to such misconduct as to prejudice the substantial rights of the defendant and require a reversal of the judgment. We are not prepared to say it was outside the lines of a proper discussion. It was but speaking of the sad consequences of the tragedy, and asking for a consideration by the jury of all facts bearing on the homi-

cide, and resulting therefrom.   The language was probably used that a livelier appreciation might be had of the enormity of the offense, and great wrong done to those dependent on the deceased, and to society at large.   The objection is untenable.

Lastly it is urged that the evidence is insufficient to support a verdict of guilty of murder in the first degree; that there is a failure of the required proof to establish the elements of premeditation and deliberation, or that there was a felonious intention to perpetrate or attempt to perpetrate a robbery, and that the killing was done while engaged in such perpetration or attempted perpetration of a robbery.   The paramount facts in the case, as disclosed by the record, essential to establish the crime charged, are, in our judgment, fully established by the evidence.   Briefly, the main features of the transactions resulting in the homicide, as shown by the evidence, are, in substance, the following:   The three defendants charged jointly with the commission of the crime came to the village of Snyder, in Dodge county, in the afternoon of January 4, 1901.   They were strangers to the citizens in that vicinity.   They remained during the afternoon and evening, until about half past eight or nine P. M., when the homicide was committed. In the village were two saloons adjoining each other, and on the east side of the main street, running north and south.   A plank sidewalk in front of the two buildings was constructed along the street, such as are usually found in small towns.   The defendants were in and out of the two saloons during the afternoon, and drinking some,—mostly beer.   They ate their lunch in the saloon of the deceased, which is situated north of the other one.   About 7:30 P. M. a citizen of the village, one Orley, passed into the south saloon and found defendants, shaking dice at the bar, who invited him to take part in the game, which he did.   After shaking dice for a short time he dropped from the game. The defendants continued in the sport for a short time longer, and then passed out of the south saloon.   Orley soon after passed out, also, and into the saloon of the de-

ceased just north. In a short period of time thereafter, Orley and one Schneider passed from the saloon of the deceased to the sidewalk in front, where they found the defendant standing with his two companions. Without other words, and almost immediately after Orley and the party mentioned had reached the sidewalk in passing out of the saloon, one of the defendants, Gardner by name, asked Orley, as testified to by him, "What the hell we were rubber-neckin' at him for," and said, "Do you think we are Pat Crow?" Orley answered, saying, "I ain't rubber-neckin' you." The defendant Rhea then moved as if to go behind Orley, who told him not to try to get behind him, as he did not allow anybody to get behind him. Just then defendant Rhea pulled his gun or revolver and told Orley to "get." This is the only evidence that by any possibility could be regarded as proof of any broil, quarrel or dispute prior to the homicide. Orley and Schneider retreated hastily into the saloon, and passed hurriedly to the rear door, through which they left the building. In going from the front to the rear door, Orley passed by the deceased, who was sitting at a card table near the centre of the room, which was forty or fifty feet in length, and paused only long enough to say to him in a moderate tone of voice, "those fellows out there have guns," or some similar remark. At the same time and closely following Orley and Schneider from the sidewalk into the saloon, the defendants Rhea and Gardner entered through the front door, with their revolvers drawn, and with the command to "throw up hands" to those within the building, of whom there were fifteen or twenty. No resistance was offered by any and many escaped through the rear door. Zahn, the deceased, arose from his chair near the centre of the room, and with his hands partly raised, started towards the defendants saying, or intending to say, "No shooting in here," or "Don't shoot in here," and before completing the sentence he was fatally shot in the abdomen by the defendant Rhea. He expired in about an hour thereafter. It is further shown by the evidence that after

the shooting the defendant went to the deceased, kicking him, and saying, "You are not much hurt," or words to that effect. Gardner, immediately succeeding the shooting, began to pace from the front to the centre of the room and back again, brandishing his revolver at those within the building and terrorizing them, for the purpose of preventing resistance or interference with their plans. Defendant Rhea passed behind the bar of the saloon or counter, threw down the cash register, broke it open, and also broke into what was apparently the money-drawer in an iron safe in the building. During the time the defendant also came from behind the bar, and searched the pockets of the deceased. After the events narrated had transpired, the three defendants left the building, and passing down the alley by its side, escaped to the eastward. The homicide was of a most aggravated character, and without, apparently, any extenuating circumstances. The defendants were seemingly bent on mischief of the most atrocious character. They proceeded to the business with a reckless disregard of life, a cool determination and desperation seldom displayed in the annals of crime. They were obviously bent on violence, and boldly set at defiance the law and the rights of the individual to security in his person and property. The evidence amply justifies the finding of the jury, and the verdict but vindicates the majesty of the law. The defendant has been accorded an impartial trial and all his rights, to which he is entitled before conviction of the crime charged, have been fully preserved by a compliance with the forms and substance of the wise and humane provisions of the law for the protection of the innocent as well as the punishment of the guilty. We find no prejudicial error in the record, and the judgment complained of should be, and accordingly is, in all things affirmed.

It is ordered that Friday, April 25, A. D. 1902, be, and the same is hereby, fixed and appointed as the day for carrying into execution the judgment and sentence of said district court.

NOTE.—*Grammar, punctuation.* Common sense should prevail over strict grammatical rules, and punctuation should not control. *Gyger's Estate*, 65 Pa. St., 311. The punctuation of a statute is not to be considered. *Cushing v. Worrick*, 9 Gray [Mass.], 382; *Hamilton v. Steamboat Hamilton*, 16 Ohio St., 428, 432.—REPORTER.