[Crim. No. 11342. In Bank. June 19, 1969.]

THE PEOPLE Plaintiff and Respondent, v. ROBERT LEE NYE, Defendant and Appellant.

Molly H. Minudri, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—Defendant was found guilty of murder in the first degree, and a jury fixed the penalty at death. This court affirmed the conviction but reversed as to penalty. (*People* v. *Nye*, 63 Cal.2d 166 [45 Cal.Rptr. 328, 403 P.2d 736].) Upon a retrial before a jury on the penalty issue, defendant was again sentenced to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

*Facts:* The evidence is set forth in some detail in our previous opinion and will be only briefly summarized here.

On January 7, 1963, defendant, who had met Susan Doctors a week previously, came by her home in Arcadia, California, to visit her. He there met her mother and younger sister. Susan agreed to go bowling with defendant the following Saturday, but asked that he telephone her before coming over. Defendant was then 20 years old, and Susan was 16.

On January 9, 1963, defendant called at the Doctors home some time between 11:30 a.m. and 1:30 p.m. At 2:30 p.m., Mr. Doctors came home and discovered his wife's body on the kitchen floor in a pool of blood. The police were summoned, and Mrs. Doctors was pronounced dead. There were 37 knife wounds in her body, 30 of which were independently adequate to have caused her death.

Mrs. Doctors' blouse had been pulled up nearly to her chest, and her capri pants and underpants had been pulled down around her ankles, exposing her pelvic area. The upper portion of the legs had been spread apart, and the right leg had been bent at the knee and flexed almost entirely to the right. There was a large quantity of blood underneath and surrounding the back and head.

Bloody footprints were in the hallway and dining room. The footprints were similar to prints made by shoes defendant was wearing at the time he was apprehended. Bloody palm prints and fingerprints were identified as those of defendant. One of the palm prints, about 5 inches from Mrs. Doctors' left hip, was identified as a print of defendant's right palm.

Mrs. Doctors' wallet and jewelry worth over $3,000, as well as a few items of Mr. Doctors' clothing, were missing. Defendant, through other persons, pawned some of the jewelry in Las Vegas, Nevada, and sold some of the missing items of Mr. Doctors' clothing. Mrs. Doctors' wallet was later found in a room which defendant had occupied, and some time thereafter a knife which could have been the murder weapon, and which contained evidence of human blood of the victim's type, was found concealed in the room. Bloody cloth-

ing left in the basement of the Doctors home and in Mrs. Doctors' car was identified as belonging to defendant.

*Questions*: First. *Did the selection of defendant's jury deprive him of due process of law?*

██ *No.* As indicated by this court in *In re Anderson,* 69 Cal.2d 613, 617 [1a] [73 Cal.Rptr. 21, 447 P.2d 117], under the recent ruling of the United States Supreme Court in *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], a prospective juror may be excused on the ground of his being conscientiously opposed to the death penalty only if he has made it " 'unmistakably clear (1) that he would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . . . or (2) that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's *guilt.*' " (391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at pp. 784-785].) ██ In the present case, in the selection of defendant's jury 25 prospective jurors were excluded because of their expressed opposition to the death penalty. (See Pen. Code, § 1074, subd. 8.) However, each of them made it unmistakably clear that he would not vote in favor of the death penalty under any circumstances, no matter what evidence was presented.

In *Witherspoon,* the Supreme Court stated at page 520 of 391 U.S. [20 L.Ed.2d at p. 783] : "If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to the penalty." In the present case, the record clearly shows that the prospective jurors were asked questions to determine which ones, if any, should be eliminated because they would "not even consider returning a verdict of death," and thus assure that defendant would be tried by a jury "neutral" with respect to the penalty.

Defendant contends that his attorney should have been permitted to examine those jurors excused by the court because of their opposition to the death penalty. ██ As stated by this court in *People* v. *Ketchel,* 59 Cal.2d 503, 529 [30 Cal. Rptr. 538, 381 P.2d 394], "The determination whether a juror has shown that he entertains 'conscientious scruples against conviction where the penalty is death' and to refuse further examination on the point [citation] reposes within the discretion of the court." ██ The same principle governs here, and no abuse of discretion has been shown.

Each prospective juror who indicated that he entertained any conscientious scruples against the infliction of the death penalty was asked by the court (with an occasional slight variation in the wording of the question), "Is it your frame of mind that you could not and you would not, under any circumstances, regardless of what the evidence might be, return a verdict carrying with it the death penalty?" Of the 25 prospective jurors ultimately excused because of their opposition to the death penalty, 23 indicated in positive terms, as soon as the court began questioning them, that they would not join in a verdict carrying with it the death penalty no matter what evidence was presented. The other two each gave an equivocal answer at first, but, upon further questioning by the court, made it unmistakably clear that they would not join in such a verdict.

Two other prospective jurors gave equivocal answers when asked if they could join in a verdict carrying with it the death penalty, but, upon further questioning by the court, stated that they could join in such a verdict, depending on the evidence. Thereafter, both of these prospective jurors were questioned on *voir dire* by the prosecution and the defense, and one of them became a member of the jury which returned a verdict imposing the death penalty.

Defendant argues that this shows that the court, instead of excusing any prospective jurors after only brief questioning, should have permitted *voir dire* examination by the prosecution and the defense. As indicated above, however, only those who made it unmistakably clear that they could not, or would not, join in a verdict carrying with it the death penalty were ultimately excused, and *voir dire* examination by the prosecution and the defense was permitted in each instance where the court was satisfied that the prospective juror could join in a verdict imposing the death penalty. There was no need for the court to permit such examination with respect to those prospective jurors who had clearly shown that they could not, or would not, under any circumstances join in a verdict imposing the death penalty.

In *People* v. *Varnum*, 70 Cal.2d 480, 492-493 [75 Cal. Rptr. 161, 450 P.2d 553], this court recently declared: "Our task requires us to assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain

what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place. The *voir dire* examination of a juror individually is not conducted in a vacuum; it is but a part of a broader process directed to an entire group of men and women designed to effectuate the selection of fair and impartial jurors. .·. . We are not unmindful of the Supreme Court's observation in *Witherspoon* that 'it cannot be assumed that a juror who describes himself as having "conscientious or religious scruples" against the infliction of the death penalty or against its infliction "in a proper case" (see *People* v. *Bandhauer,* 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900, 905]) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him.' (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 515-516, fn. 9 [20 L.Ed.2d 766, 781].) But neither the words 'in a proper case' nor any other words, taken alone, can be seized upon as a touchstone by which to determine the quality of the juror under *Witherspoon.* We must evaluate them in context."

In the *voir dire* examination in the present case, the words "in a proper case" were frequently used. However, as in *Varnum, supra,* prior to the time any jurors were excused for cause because of conscientious objections to the death penalty it was made clear that what was a proper case for imposition of the death penalty was for the determination of the individual jurors. Thus, in addressing the prospective jurors before they were questioned, the trial judge stated: "In cases of murder on the penalty phase of the case, the jury selects the penalty, it being either life imprisonment or the death penalty, depending upon the absolute discretion of the jury. You and you alone will determine that matter." The trial judge, in the presence of the assembled group of prospective jurors, elaborated upon this explanation in his *voir dire* examination of one of the first prospective jurors who expressed a conscientious objection to the death penalty[1] and

[1]During the course of such examination, the trial judge stated: "You're entitled to your opinions as a citizen. We all are. And some are opposed to the death penalty in any kind of a case, and some are not. And in a case of this kind, it is within the absolute discretion of a juror or a jury to return a verdict carrying with it the death penalty, or on the other hand life imprisonment. And this is an area which is not defined by any rules in the law. The Legislature has not preferred one penalty over the other one. It leaves it to the entire discretion of a jury to determine what penalty shall be imposed, depending upon what the evidence is.

in questions put to the individual prospective jurors further emphasized that the question of what was a proper case for imposition of the death penalty was for the jury to determine.[2]

Likewise, questioning by both the deputy district attorney and defendant's attorney on *voir dire* clearly indicated to the prospective jurors that the determination of what was a proper case for the imposition of the death penalty was for the jury to make.[3]

Under the circumstances, no further explanation was required, each member of the jury panel having been made to understand that the choice of penalty to be imposed, life imprisonment or death, was to be in the jury's absolute discretion.

■ Second. *Did the trial court prejudicially err in instructing the jury in this penalty phase of the trial as to the crimes of rape, burglary, robbery, and forgery?*

*No.* There was evidence from which the jury could have concluded that defendant committed the crimes of rape, bur-

---

"Now, you see if the Court were to permit jurors who would not, under any circumstances, return a death penalty verdict, to sit upon the jury, it would be tantamount to the repeal of those sections of the Code and the acts of this State by me, and I have no power to do it. I must follow the law."

[2]Typical of the questions which the trial judge asked jurors who claimed to have no conscientious scruples against the infliction of the death penalty are the following: "Is it your frame of mind that you could and you would, depending of course entirely on the evidence, in a proper case, if you felt it was proper, return a verdict which would carry the death penalty?" "Is it your frame of mind that you could and you would join with your fellow jurors in a verdict which would carry the death penalty, if you felt, from all the evidence in the case, that that was the proper penalty?" "In other words, it is your frame of mind that you could and you would, after the whole picture of the case is presented to you, depending upon the evidence and the deductions to be drawn, that you could, if it were in your opinion a proper case, could you and would you join with your fellow jurors in a verdict that would carry the death penalty?"

[3]For instance, the deputy district attorney questioned some of the prospective jurors, as follows: "If the Court should advise you . . . that the law views life imprisonment and the death penalty as being equal, submits both to the jury and admonishes them to determine which is the proper one under all the circumstances by the use of sound judgment, would you approach the choice of the penalty in that light, sir?" "Now considering the very serious responsibility that could be yours in this case to determine whether this defendant should forfeit his life to the State, is there any reason that you can think of that would cause you not to wish to undertake that responsibility?"

Defendant's attorney, in questioning some of the jurors, asked: "In other words, you would be inclined to do what the law requires of you, and that is consider the evidence on all sides and then select, at your absolute discretion, what you consider to be the appropriate penalty, is that correct?"

glary, and robbery in the perpetration of the killing of Mrs. Doctors. Hence, the relevancy of such crimes is clear, and evidence thereof was admissible under section 190.1 of the Penal Code as "circumstances surrounding the crime." The fact that defendant had not been prosecuted for such offenses is immaterial. (*People* v. *Tahl,* 65 Cal.2d 719, 738 [12] [56 Cal.Rptr. 318, 423 P.2d 246]; *People* v. *Ketchel,* 59 Cal.2d 503, 542 [49] [30 Cal.Rptr. 538, 381 P.2d 394].)

Although the trial court would not have been required on its own motion, to instruct on the elements of the offenses (*People* v. *Tahl, supra,* 65 Cal.2d 719, 738 [13]), it was not error for the trial court to give instructions thereon. It was, as a matter of fact, just as much to defendant's benefit as to the People's that the jury receive instructions on the elements of these offenses, so as to be able to evaluate properly defendant's acts relating to the killing of Mrs. Doctors. This is particularly true in view of the fact that both defendant and the People were entitled to present evidence at the penalty phase relating to defendant's guilt and that a different jury had heard the evidence on the guilt issue. (See *People* v. *Terry,* 61 Cal.2d 137, 145-147 [4a] [37 Cal.Rptr. 605, 390 P.2d 381].)

■ There was, however, no justification for presenting the evidence on forgeries committed by defendant and instructing the jury regarding them. Defendant was never prosecuted for the forgeries, and the only evidence of their commission consisted of his own admissions. In *People* v. *Hamilton,* 60 Cal.2d 105, 129 [18] [32 Cal.Rptr. 4, 383 P.2d 412], the court pointed out that evidence of the commission of a prior crime may not be proved by the introduction of evidence of an extrajudicial admission without proof *aliunde* that such a crime had been committed. In the present case, as indicated above, such other proof was lacking. As a result, defendant's admissions should not have been received, and the trial court should not have given instructions on the crime of forgery.

The evidence as to the forgeries, however, was very brief, and the offense far less serious than the other crimes committed by defendant, evidence as to which was properly before the jury. Under the circumstances, after an examination of the entire cause, this court is of the opinion that it is not reasonably probable that a result more favorable to defendant would have been reached had the evidence of the forgeries been excluded and the instructions thereon not given. (Cal.

Const., art. VI, § 13; see *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

Third. *Did the trial court err in refusing certain instructions requested by defendant?*

■ *No.* Defendant contends that it was error for the trial court to refuse two instructions proposed by him relating to factors which the jury might consider in determining the penalty.[4] The instructions purportedly were based on this court's holdings in *People* v. *Polk,* 63 Cal.2d 443 [47 Cal. Rptr. 1, 406 P.2d 641], *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], and *People* v. *Friend,* 47 Cal.2d 749 [306 P.2d 463]. The trial court refused the instructions, because they were submitted after conclusion of defendant's argument and for "other reasons."

Defendant's belated presentation of the proposed instructions provided a sufficient reason for their denial. (*People* v. *Lang,* 142 Cal. 482, 486 [76 P. 232]; *People* v. *Pearson,* 150 Cal.App.2d 811, 821 [311 P.2d 142].) In any event, the refusal of similar instructions was held proper in *People* v. *Hillery,* 65 Cal.2d 795, 807 [56 Cal.Rptr. 280, 423 P.2d 208], where it was said: "*Friend* was explicitly overruled by *People* v. *Morse* (1964) 60 Cal.2d 631, 637 fn. 2, 649 . . . with respect to comment on the possibility of parole. Moreover, the

---

[4]The proposed instructions read: "The jury may properly take into consideration factors which impel human conduct. You may consider the effect of human passion, ignorance and weakness. You may consider possible uncertainties attaching to life imprisonment as against the irrevocableness of an executed sentence of death. You may choose between stern retribution or the exercise of pity. You may properly display clemency and sympathy toward the Defendant or you may, with equal right under the law, be unmoved by these considerations."

"In arriving at your decision you are entitled to keep in mind that this state has accepted the view that, generally speaking, punishment should be fitted to the perpetrator of the crime, not merely the crime. The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender. In prescribing punishment you are not limited to the usual function of finding whether or not certain events occurred and certain consequences resulted. Before you decide the issue of life or death, you must consider the facts surrounding the crime and the Defendant's back ground. You must decide whether the Defendant should be permitted to live upon the basis of a complete and careful analysis of him as a human composite of emotional, psychological and genetic factors. You must look at the Defendant as a whole being and determine if he is fit to live. In the exercise of this responsibility you are entitled to consider whatever facts help you to understand the circumstances which would bring a human being to this moment of judgment. The jury has no guidelines and no standards beyond those which a lifetime of experience has provided. These you are expected now to draw upon in rendering your decision which must be fair under all of the circumstances as they are known to you."

quoted language in *Friend* was directed at the scope of *permissible comment* and delineation of areas which jurors *may* consider. Such cases as *People* v. *Morse, supra, People* v. *Hines* (1964) 61 Cal.2d 164, 168-169 . . . and *People* v. *Terry* (1964) 61 Cal.2d 137, 154 . . . have recognized that the jury must decide the awesome question of life or death 'without benefit of guideposts, standards or applicable criteria.'

"No error resulted from the court's rejection of defendant's proposed instruction, since that part which referred to deterrence was disapproved by *People* v. *Morse, supra,* 60 Cal.2d 631, and that part which enumerated factors for the jury's consideration was more correctly covered by another of defendant's requested instructions based upon *Morse, Terry,* and *Hines.*"

In addition, the trial court gave a proper instruction relating to the factors to be considered by the jury in determining the penalty.[5]

Accordingly, in view of the late submission of the proposed instructions, their inappropriateness, and the giving of a correct instruction on the subject, the trial court did not err in refusing the instructions requested by defendant.

Fourth. *Did the trial court abuse its discretion in admitting into evidence photographs (a) of the deceased and (b) of the victim in a collateral offense?*

*No.* ■ It is clear that a trial court may receive unplea-

---

[5] The following instruction was given: "The defendant in this case has been found guilty of the offense of murder in the first degree, and it is your duty to determine which of the penalties provided by law should be imposed for that offense. In arriving at this determination you should consider all of the evidence received here in court presented by the people and defendant throughout the trial before this jury. You may also consider all of the evidence of the circumstances surrounding the crime, of the defendant's background and history, and of the facts in aggravation or mitigation of the penalty which have been received here in court. However, it is not essential to your decision that you find mitigating circumstances on the one hand or evidence in aggravation of the offense on the other.

"It is the law of this state that every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life, at the discretion of the jury. If you should fix the penalty as confinement for life, you will so indicate in your verdict. If you should fix the penalty as death, you will so indicate in your verdict. You are entirely free to act according to your own judgment, conscience and absolute discretion. That verdict must express the individual opinion of each juror.

"Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and absolute discretion of the jury. In the determination of that matter, if the jury does agree, it must be unanimous as to which of the two penalties is imposed."

sant photographs in evidence after making an independent determination that their probative value outweighs any possible prejudice to the defendant. (*People* v. *Mathis,* 63 Cal.2d 416, 423 [1] [46 Cal.Rptr. 785, 406 P.2d 65].) ▮▮▮ In the present case, the trial court made specific findings to that effect with respect to the photographs under consideration.

The disputed photographs of Mrs. Doctors' body are unquestionably relevant and material to the People's theory of murder in the perpetration, or attempted perpetration of rape. They show the position of the body with the legs apart; the disarray of the clothing; the place where defendant left his palm print, footprints, and knife sheath near the body; and the swirls of blood around the left buttock and in front of the pelvic area, from which it can reasonably be inferred that the body was rotated after death. Also, in showing the extent and location of the 37 stab wounds, the photographs were relevant and material on the question whether defendant acted with malice aforethought.

In the previous opinion herein (63 Cal.2d 166), it was held that the trial court's determination that the probative value of the photographs outweighed any possible prejudice to defendant did not constitute an abuse of discretion. (P. 170 [2].) ▮▮▮ Defendant seeks to distinguish the admissibility of the photographs at the earlier guilt phase from their admissibility at the penalty phase now on review. However, since section 190.1 of the Penal Code specifically provides for the admission of evidence ''of the circumstances surrounding the crime . . . and of any facts in aggravation or mitigation of the penalty,'' defendant's argument is untenable.

As pointed out in *People* v. *Jones,* 52 Cal.2d 636, 647 [4] [343 P.2d 577]: ''[I]t is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue. it is admissible on the trial aimed at fixing the penalty.'' (See also *People* v. *Terry, supra,* 61 Cal.2d 137, 145-147.)

▮▮▮ The jurors were told, in the prosecuting attorney's closing argument and in the instructions, to consider the photographs for the sole and limited purpose of illustrating defendant's state of mind and the testimony of the People's witnesses regarding the position of the body and the condition of the clothing. The jurors were also admonished ''not to allow your emotions to control or play any part in your deliberations in this matter,'' and they must be deemed to

have obeyed the instructions. (*People* v. *Talbot*, 64 Cal.2d 691, 706 [8] [51 Cal.Rptr. 417, 414 P.2d 633].)

Defendant also objected to the introduction into evidence of photographs of Dallas Smith, whom he had attacked with a piece of pipe in Phoenix less than two weeks after killing Mrs. Doctors. Defendant had met Smith in Las Vegas after fleeing the state following the murder, and the two thereafter proceeded together to Phoenix. On the evening of their second day in Phoenix, Smith fell asleep while watching television in his motel room. He was awakened when defendant began hitting him over the head with a piece of lead pipe. Smith finally managed to escape and summoned the police. He was taken to a hospital, where 28 stitches were sewn into his head, and splints were placed on his fingers, which had been fractured when he had attempted to protect himself by putting his hands on the top of his head.

Smith testified at the previous trial, but was out of the state at the time of the retrial on the penalty issue. The district attorney therefore read into evidence Smith's testimony given at the guilt phase, and, as part of the reading of this testimony, the People introduced into evidence two photographs of Smith, showing him with bandages on his head and hands.

There is nothing gruesome or even unpleasant about the photographs of Smith. The bandages do not appear to be unusually thick, and there is no blood on them or on Smith's face. The photographs were clearly relevant to show the severity of defendant's attack on Smith, and their admission into evidence was proper.

Fifth. *Did the trial court err in excluding from evidence (1) a motion picture relating to defendant's earlier years and (2) a court martial report?*

*No.* Defendant contends that a film allegedly portraying his activities at the Arizona Boys' Ranch was admissible as tending to show his ''background and history . . . and . . . facts in . . . mitigation of the penalty.'' (Pen. Code, § 190.1.)

Had the film been even to a partial degree an accurate portrayal of defendant's adolescent years, the trial court undoubtedly would have allowed it to be shown to the jury. However, as is evident from the argument on defendant's offer of the film and on his motion for a new trial, the film does not even attempt to portray defendant's activities at the ranch. Rather, it was a staged and contrived presentation, in which a paid professional actor is shown around the ranch by

defendant, who plays the part of a boy at the ranch, the purpose of the film being to interest prospective donors in contributing to the support of the ranch. Under the circumstances, it was irrelevant and immaterial on the issue of penalty, and the trial court properly excluded it.

It should be noted that the scope of admissible evidence under section 190.1 of the Penal Code is not so broad as to allow the introduction into evidence of anything no matter how remote its relation to the defendant's background. (See *People* v. *Mitchell,* 63 Cal.2d 805, 814-815 [5] [48 Cal.Rptr. 371, 409 P.2d 211].)

Defendant also offered in evidence a portion of a statement by one Eppley taken from a report of court martial proceedings against defendant. The trial court properly rejected this evidence, as it was clearly inadmissible hearsay. (Evid. Code, §§ 1200, 1290-1292.) Objectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase. (*People* v. *Hamilton, supra,* 60 Cal.2d 105, 128-131.)

Sixth. *Did the trial court commit prejudicial error in permitting the prosecution to open and close the argument at the penalty phase?*

*No.* The customary procedure on a criminal trial, in both the guilt phase and the penalty phase, has been for the prosecution to open and close the argument to the jury. (Pen. Code, § 1093, subd. 5); but the trial court may, in its discretion, for good reasons, depart from the prescribed order (Pen. Code, § 1094).

A contention that it was error to permit the prosecution to open and close the argument at the penalty phase has been rejected on several occasions. (*People* v. *Smith,* 63 Cal.2d 779, 795 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Love,* 56 Cal.2d 720, 725 [1] [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].) However, in a decision filed after the proceedings below had been concluded the prior rulings were reconsidered, and it was held: "Although we are of the opinion that there is no reasonable probability that the sequence of closing argument alone would affect the result (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 836 . . .), we believe that scrupulous regard for complete impartiality and fairness dictates that the extent of the argument on each side at the trial on the issue of penalty should be equal and that each side should have an opportunity to rebut the argument of the other. Accordingly *hereafter* the prosecution should open and the defense respond. The prosecution may then

argue in rebuttal and the defense close in surrebuttal.'' (Italics added.) (*People* v. *Bandhauer,* 66 Cal.2d 524, 531 [9]· [58 Cal.Rptr. 332, 426 P.2d 900].)

In the present case, the trial court was following existing law when it refused to depart from the established rule in setting the order of the closing arguments. Furthermore, the prosecuting attorney's argument was restrained, he did not deviate from the evidence, and no suggestion is made that he took any undue advantage of his right to close the argument. Under the circumstances, the holding in *Bandhauer* having been made clearly prospective, no prejudicial error has been shown.

Seventh. *Did the trial court err in denying defendant's motions to strike portions of the prosecution's cross-examination of the defense psychiatrist?*

 *No.* Defendant contends that several of the prose-. cuting attorney's questions directed on cross-examination to Dr. Davis, the defense psychiatrist, constituted prejudicial misconduct and that the trial court erred in denying defendant's motions to strike these questions and answers.

In summary, the questions of the prosecuting attorney which defendant assigns as error were generally objected to and include references to (1) defendant's testimony at the first trial admitting he had lied to the police because he felt it would do him the most good, (2) the possibility that defendant had testified falsely at the previous trial because he believed that it would do him the most good, (3) the fact that defendant's prior story conflicted with that which he told Dr. Davis, (4) defendant's having told another psychiatrist on a previous occasion that Mrs. Doctors was still alive when defendant left the Doctors house on the day of the murder, and (5) defendant's conviction for drunk driving and commission of the offenses of burglary, forgery, and issuing bad checks. Defendant further contends that in cross-examining Dr. Davis, the prosecuting attorney (6) incorrectly stated the evidence in the present proceeding by failing to refer to the allegedly tentative nature of defendant's date with Susan Doctors, and (7) improperly made use of the photographs of Mrs. Doctors' body in questioning Dr. Davis. ·

Defense counsel also made a subsequent motion to strike these portions of the cross-examination and moved for a mistrial, but both motions were denied.

In evaluating the propriety of the prosecuting attorney's action, the following must be borne in mind: Although he did

not do so at the first trial, in the present proceeding defendant ended his courtroom narrative at a point in time several days prior to his first meeting with Susan Doctors, thus avoiding the possibility of impeachment. Defense counsel adroitly resumed defendant's narrative through the testimony of Dr. Davis, who testified as to defendant's version of the events of January 1963 on the basis of what defendant had told him almost four years after the first trial.

From Dr. Davis' testimony on direct examination, it was evident that he had based his opinion (that defendant was not consciously aware of killing Mrs. Doctors while doing so) primarily on the story which defendant had related to him. Dr. Davis' testimony conflicted directly with the prosecution's evidence, which had shown that defendant acted with premeditation and malice aforethought in murdering Mrs. Doctors in the perpetration of a robbery and rape or attempted rape.

In this context, it was incumbent on the prosecution to try to weaken the force of Dr. Davis' testimony by cross-examining him extensively as to the basis for his medical opinion that defendant had not acted with premeditation or malice aforethought and was telling the truth.

Dr. Davis was, of course, subject to the broad cross-examination permitted of any witness. (Evid. Code, § 773, subd. (a).) In addition, he could be cross-examined even more extensively by reason of his status as an expert witness. (Evid. Code, § 721, subd. (a), based on former Code Civ. Proc., § 1872.)

Section 721, subdivision (a), of the Evidence Code provides: "Subject to subdivision (b), a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, *may be fully cross-examined as to* (1) his qualifications, (2) the subject to which his expert testimony relates, and (3) *the matter upon which his opinion is based and the reasons for his opinion.*" (Italics added.)

■ The following language from *People* v. *Jones,* 225 Cal.App.2d 598, 611 [15] [37 Cal.Rptr. 454] (hearing denied), sets forth the permissible scope of cross-examination where an expert witness is concerned: " 'Once an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, *the reasons for his opinion including facts and other matters upon which it is*

*based* (Code Civ. Proc., § 1872), and which he took into consideration; and he may be "*subjected to the most rigid cross-examination*" *concerning* his qualifications, and *his opinion and its sources* [citation].' (Italics added.) [Citation.]"

The *Jones* case bears a strong resemblance to the present case and warrants quotation at length. In *Jones,* the defendant assigned as error ". . . what he denominates the 'irrelevant cross-examination questions put to two defense psychiatrists about appellant's past sexual history [which] exceeded the scope of direct examination, assumed facts not then or ever properly introduced into evidence, and were asked solely to inflame the passions and prejudices of the jury against appellant.' " (225 Cal.App.2d at pp. 610-611.)

The Court of Appeal held: "It should be noted that this expert's ultimate opinion regarding appellant's mental condition at the moment of the killing was not based directly upon '*facts*' but rather upon his own preliminary '*opinions*' concerning appellant. That is, the doctor's belief that appellant was telling him the truth when he denied any memory of the actual killing is clearly an opinion or conclusion of the doctor's and not a fact. Likewise, the determination made by the doctor that the killing was a 'senseless act without motivation' was only his opinion or conclusion and not a demonstrable fact.

"The prosecuting attorney sought to overcome the effect of this expert's testimony by inquiring whether he would change the intermediate and supporting opinions upon which his ultimate opinion rested if certain additional facts were known to him. To this end, he inquired whether the doctor had made an independent investigation of the prior criminal sexual offenses that were related to him by appellant in an effort to determine (1) whether appellant's version thereof was truthful, and (2) whether a full knowledge of these offenses might not render the present act less 'senseless.' The doctor indicated that he had not made such an investigation.

"The prosecuting attorney thereafter asked a number of questions relating primarily to a prior incident contained in the doctor's report which was based upon information supplied to him by appellant. . . .

"Thereafter, a number of questions were asked which, at least by implication, indicated that appellant's version of this incident was false. . . .

"We find no error in these proceedings. . . .

". . . . If these questions are asked in good faith they are

proper, although they are, of necessity, based upon facts not in evidence. [Citation.]

"As indicated, the prosecuting attorney stated that he was ready and able to prove any facts not in evidence that might be implied in his questions if the expert's answers indicated that his opinion would be altered by the presence of such facts. Ultimately the expert stated that his opinion would not be changed by any suggested additional facts so that the issue was thus terminated." (225 Cal.App.2d at pages 611-613.) (See also *People* v. *Ney,* 238 Cal.App.2d 785, 796-798 [48 Cal.Rptr. 265].)

In *People* v. *Hamilton, supra,* 60 Cal.2d 105, the prosecuting attorney, in questionable faith, sought to discredit certain defense witnesses who at the guilt phase of the trial evidently were not testifying as experts. At the penalty phase, the prosecuting attorney engaged in such attempts during the cross-examination of the defendant himself in an apparent attempt to bring before the jury the contents of an inadmissible document. It was found that such errors constituted prejudicial misconduct, and the judgment was reversed insofar as it related to the death penalty. (60 Cal.2d at pages 133-134, 137-138.)

The cross-examination of Dr. Davis in the present case, however, is readily distinguishable from what was found objectionable in the *Hamilton* case. As the foregoing authority shows, the nature and scope of the cross-examination allowed in the case of an expert witness is entirely different from that allowed in the case of an ordinary witness. It was upon this basis that the trial court made its ruling in denying defend- ant's motion to strike the disputed portions of the cross-examination, and the jury was instructed on this theory. The circumstances of the instant case clearly justified the prosecution's attempt to discredit Dr. Davis' psychiatric opinion, which was at odds with the evidence introduced by the prosecution.

Nor is there any indication of bad faith on the part of the prosecuting attorney in the present case. The record, as well as the first opinion in this case (63 Cal.2d 166), suggests that the prosecuting attorney had in his possession evidence upon which he based his cross-examination. The transcript of the first trial was used by both the prosecution and the defense during the present proceeding, and it appears that if Dr. Davis had indicated that the suggested additional facts would change his opinion, the evidence would have been produced.

With respect to defendant's claim that the prosecuting

attorney misstated the evidence regarding the allegedly tentative nature of Susan's date with defendant, it should be noted that although the date was referred to as "tentative," Susan testified, "It was a date. I asked him to call me before he came over and verify it."

 Notwithstanding defendant's contention to the contrary, it was proper for the prosecuting attorney to cross-examine Dr. Davis, as to the photographs of Mrs. Doctor's body, since this documentary evidence could have a bearing on Dr. Davis' opinion that defendant had no express sexual interest in Mrs. Doctors.

For the foregoing reasons, the trial court did not err in denying defendant's motions to strike the disputed portions of the prosecuting attorney's cross-examination of Dr. Davis.

 Eighth. *Is the death penalty cruel and unusual punishment and section 190 of the Penal Code, insofar as it provides for the death penalty, therefore unconstitutional?*

*No.* Defendant's contention that the death penalty is cruel and unusual punishment and that section 190 of the Penal Code, insofar as it provides for the death penalty, is therefore unconstitutional was decided adversely to him by this court in *In re Anderson, supra,* 69 Cal.2d 613, 629-631.

Ninth. *Did the trial court coerce the jury into returning a verdict which would otherwise not have been rendered, thus committing prejudicial error?*

*No.* Defendant contends that the trial court committed prejudicial error in coercing the jury into rendering a verdict after the jury had indicated it was "hopelessly deadlocked." The jury retired for deliberation at 3:40 p.m. February 15, 1967, and was taken to a hotel at 5 p.m. The jury continued its deliberations on February 16 from 8:45 a.m. to 4:30 p.m. On February 17, the jury began its deliberations at 8:30 a.m., and at 3:30 p.m. reported its inability to reach a verdict.

The foreman informed the trial court: "Notwithstanding our request at one hour ago . . . we have had one more hour to deliberate. . . . And we have come to the conclusion that we cannot come to an agreement."

The trial court thereupon stated to the jury: "Well, you have been working hard all day, ladies and gentlemen, and sometimes if you get a night's rest, you may be able to resolve your differences. We have been trying this case for quite some time, and it is desirable, if it can reasonably be done, to arrive at a verdict. So I am going to give you a little further time to

consider the matter, and perhaps that will solve your problems.'' The foreman replied, ''All right, your Honor.''

The jury then retired to the hotel, which the trial court remarked was purportedly ''one of the best hotels.'' The jury resumed its deliberations the next day, February 18, at 9 a.m., and reached a verdict at 6 p.m. that day. Since no court personnel was available at that hour, the verdict was rendered the following day.

As stated by this court in *People* v. *Burton,* 55 Cal.2d 328, 356 [38] [11 Cal.Rptr. 65, 359 P.2d 433], ''Whether statements of a trial judge amount to coercion of a verdict is peculiarly dependent upon the facts of each case.''

Here, it is clear the trial court gave the jurors no indication of being impatient for a verdict. The judge's words to the jury after they had returned from inconclusive deliberations were mild and sympathetic. It is significant, also, that the jurors apparently did not report to the trial court how many had voted for the death penalty and how many for life imprisonment (*People* v. *Burton, supra,* 55 Cal.2d 328, 356 [39]); and there is nothing to suggest that the court was urging any particular verdict. Furthermore, the trial court, in requesting the jury to take further time to try to resolve their differences, could properly consider the fact that a full month had been consumed for the trial. (*People* v. *Tarantino,* 45 Cal.2d 590, 600 [290 P.2d 505].) Under the circumstances, the trial court did not err in any respect to its disputed remarks to the jury.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied July 16, 1969. Mosk, J., did not participate therein.