Melchor ORTEGA, Appellant,

v.

The STATE of Texas, Appellee.

No. 43084.

Court of Criminal Appeals of Texas.

Nov. 10, 1970.

Rehearing Denied Dec. 31, 1970.

Charles A. Tucker, Marvin O. Teague, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and Erwin G. Ernst, Asst. Dist. Attys., Houston, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is rape by force; the punishment, death.

Prosecutrix, while asleep in bed with her husband and three year old daughter, was awakened by her husband's remark, "Oh my God, no." She then saw a man, whom she positively identified as appellant, standing near the bed. He commanded prosecutrix's husband to turn his face to the wall, and brandished a knife with a hooked blade at the husband, with vile threats that he would kill the husband and the child. Appellant forced prosecutrix to commit an act of oral sodomy upon him and allow him to commit acts of intercourse with her, both rectally and vaginally. All this occurred in the presence of her husband and child.

■ Appellant's first three grounds of error relate to the manner in which the court excused certain veniremen because of their assertion that in no case, regardless of the facts, could they vote to impose the death penalty. We have examined the testimony of each such venireman, using Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, as a window through which to view their commitments against death as a proper punishment in a rape case. The State and the court ques-

tioned each venireman and venirewoman carefully in an effort to trace the language found in Witherspoon. We quote from the examination of each venireman so excused. Venireman Thomas, after being questioned thoroughly, answered as follows:

Q. And if the Judge told you that it also carried any number of years in excess of five, could you consider that?

A. Yes.

Q. And if the Judge told you you could in fact impose life imprisonment, could you consider that?

A. Yes.

Q. And if the Court told you one of the possible punishments was by death, could you consider that?

A. For just rape?

Q. Yes.

A. No.

Appellant's counsel was unable to shake Mr. Thomas from his view.

Venireman Hurd answered the Court as follows:

Q. You do not feel there is any case where you as a juror would or could ever impose death under any circumstances?

A. No.

While being questioned, Venirewoman Wright answered as follows:

Q. You can't think of any set of facts and circumstances which would render proper such a penalty in your personal opinion?

A. No.

She gave the Judge substantially the same answers.

Venireman Burchfield answered as follows:

Q. Did I understand by your answers to his questions that in any case where the offense of rape were involved that you, irrespective of what the facts in a case might be and irrespective of how convinced you might be of the guilt of a person charged with such offense, that you automatically would vote against the death penalty?

A. Yes, sir, I would.

Q. You just could not and would not? Would there be any facts where you could consider that to be a proper punishment.

A. No, sir.

Venirewoman Le Blanc, after full interrogation, answered:

Q. There just are no facts where you could consider imposing death as a punishment for one you had found guilty of the offense of forcible rape?

A. No. I get touchy about death penalties.

\* \* \* \* \* \*

A. I do not believe in the death penalty under any circumstances.

Venireman Mosley answered in part as follows:

Q. And as a juror, would you in any case that you felt the facts were extremely bad in the case, would your conscience permit you to assess the penalty of death?

A. No, sir.

Q. Under no circumstances?

A. No, sir.

Q. Then do I understand in your thinking that you would automatically exclude consideration of the punishment of death for anyone you had found guilty of rape as a juror?

A. Yes, sir.

Venirewoman Nolan, when being questioned as to proper punishment in a forcible rape case, answered as follows:

Q. Would you automatically exclude consideration of the death penalty as a proper punishment?

A. Yes.

Venireman Osterman answered as follows:

Q. I will ask you if you have any conscientious scruples against the assessment of death as a proper punishment in a rape case where you thought the facts called for it?

A. Sir, I couldn't do it if it was left up to me. I could not—capital punishment, I could not.

Q. Do I take it fairly from your answer that as a member of a twelve-man jury you could not individually think of any set of facts and circumstances which will render it possible for you personally to return such a verdict?

A. No, sir, I could not.

Q. Does that mean that in all rape cases no matter what the facts or circumstances you would automatically exclude consideration of the death penalty and vote against it?

A. Yes, sir, In any case.

Venireman Bloomquist answered as follows:

Q. Mr. Bloomquist, as the Court would understand, you do not feel there could be any facts and circumstances surrounding the commission of the offense of forcible rape which to your mind would warrant and justify and render it proper to impose death as a punishment even though the law authorized it, sir? Is that your position.

A. That's my position, yes.

Q. You would, as you have advised Counsel, automatically exclude considera-

tion of that penalty irrespective of whether you found a person guilty and irrespective of what you found the facts and circumstances to be?

A. Yes, sir.

Venireman Britt answered as follows:

Q. I take it from your answer you cannot conceive of any set of facts and circumstances which would render it possible for you personally to render death as a verdict in a rape case.

A. Yes, sir.

Venireman Stelly answered as follows:

Q. I take it from your answer you could not conceive of any set of facts and circumstances in a rape case that would render it possible for you personally to return a death verdict?

A. I don't feel I could, sir.

Q. Does this mean you would automatically vote against and exclude consideration of the death penalty in a rape case if you were sitting as a juror considering punishment of one you had already found guilty?

A. My personal feeling, yes. I don't think I could vote for the death penalty.

Q. You qualify that. Could you or could you not?

A. I could not.

Venireman Sanders answered as follows:

Q. Does your answer mean that you cannot conceive of any set of facts and circumstances which to your mind would warrant, justify and render it proper for you to participate in such a verdict?

A. I'm sorry. I can't see a death penalty for anything.

Q. Just so that we can all be sure now and everything is proper in the record, I want to ask you one more question. Does this mean you would automati-

cally exclude consideration of the death penalty in any rape case in which you were a juror no matter what the facts were?

A. Yes.

Venireman Young answered as follows:

A. I wouldn't give the death penalty.

Q. Does this mean that you as a member of a twelve-man jury—

A. I wouldn't.

Q. —you would automatically exclude consideration of the death penalty in any rape case, is that correct?

A. Yes, sir.

He answered the Court in the same manner.

Venireman Kent answered as follows:

Q. My question to you is do you have any conscientious scruples against the assessment of death as a proper punishment for the crime of rape where you think the facts call for it?

A. I don't believe in the death penalty.

Q. Under any circumstances?

A. Under any circumstances.

Q. I take it then you would automatically exclude consideration of the death penalty no matter what the facts were even though you had already found this individual guilty?

A. I would.

Venireman Burton answered as follows:

Q. My question to you is do you have any conscientious scruples against the assessment of death as a proper punishment for the crime of rape if you think the facts call for it?

A. Yes, I do.

Q. Do I take it from your answer you would automatically exclude consid-

eration of the death penalty as a punishment for the crime of rape no matter what the facts were?

A. Yes sir, I would.

Venireman Lovell answered as follows:

Q. Does this mean you could never think of any facts and circumstances in a rape case, not a murder case or any other kind of capital crime, but a rape case that would justify you to your mind participating as a member of a jury bringing in a death verdict in that rape case?

A. No.

Venireman Bohac answered as follows:

Q. Does this mean you would automatically exclude consideration of the death penalty in any rape case no matter what the facts were when you had already found somebody guilty of that offense?

A. I think I would.

Q. If I don't ask you, the Court will. Without qualification you either do or don't. Are you sure you would exclude consideration of death? You wouldn't consider it at all under any facts or circumstances?

A. No.

Venireman Collier, when being questioned as to death as a proper punishment for rape, answered:

A. I could not return a death verdict under any circumstances.

Venirewoman Hartsell, after much interrogation answered as follows:

Q. I need to know what your general philosophy and feeling is, your general principles and what I'm interested in at this time is can you conceive of a set of facts and circumstances which would justify you personally returning a verdict of death in a rape case

where nobody was killed, no children are involved. It's on an adult woman.

A. No.

Q. Would you automatically exclude consideration of death as a punishment in a rape case?

A. Yes.

Venireman Sappell answered as follows:

A. I do not believe in capital punishment.

Q. You don't believe in it at all?

A. No.

Q. Does this mean you would automatically exclude death as a punishment for the crime of rape no matter what the facts are?

A. That's right.

Venireman McCay answered as follows:

A. You mean do I believe in the death penalty?

Q. Boiling it all down to the simplest terms, do you believe in the death penalty?

A. No, I don't.

Q. Does this mean you would automatically exclude consideration of death as a punishment in a rape case, or in any case?

A. Not in any case.

Q. And you would disregard then that portion of our law and would not consider it under any circumstances?

A. No, I would not.

Venirewoman Cornish answered as follows:

Q. What I'm asking you is can you as a juror in any case, no matter what the facts, would you consider death as a proper punishment for the crime of rape?

A. No.

Q. Does that mean you would automatically exclude and you would not personally render such a verdict no matter what the facts were in a rape case?

A. Yes.

Venireman McCagg told the State:

A. I don't believe in capital punishment.

Q. Does that mean you would automatically exclude consideration of the death penalty in a rape case if you were on the jury no matter what the facts were?

A. Yes, sir, I believe so.

He told the Court:

A. I believe in the law, the justice, all right, but I don't believe in the death penalty, Your Honor.

Q. And you would not consider in any case imposing death as a punishment even though the law authorized that as one of the penalties?

A. No, sir.

Venireman Fennen answered as follows:

Q. I take it then there are no facts and circumstances to your mind which would justify you in bringing in such a verdict?

A. That's right.

Q. And you would automatically exclude consideration of the death penalty no matter what the facts?

A. For that offense.

Venirewoman Boethel answered as follows:

Q. What we are interested in knowing is if there is any case in which you feel you could assess the penalty of death as a punishment for one found guilty of the offense of rape.

A. I don't think so.

Q. You understand that if you were a juror the verdict of the jury must be the verdict of each individual juror as well as all twelve?

A. Yes.

Q. When you say you don't think so, do you feel you would automatically exclude that as a punishment in all cases irrespective of what the circumstances might be? Is that your position?

A. Well, I believe in life punishment—

Q. I will ask you about each of the others later. Now I'm asking about that phase of the law authorizing a jury to impose the death penalty.

A. No.

Q. You would not under any circumstances impose death as a punishment?

A. No.

I. The above is a fair condensation of this lengthy voir dire examination. It is apparent from the above that the venire was examined far more thoroughly than was the venire in Pittman v. State, Tex.Cr. App., 434 S.W.2d 352; and clearly each member of the venire who was excused passed the tests set forth in Witherspoon and Pittman.[1]

II. We next approach the contention that the court erred in sustaining the State's challenges for cause regarding the death penalty and in refusing to permit appellant to question the veniremen. Appellant argues that he should have been permitted to question the excused veniremen even if adequate grounds for challenge had already been shown.

The first venireman to whom the State's challenge for cause was sustained was Gerald Thomas. He was interrogated by the State and by the appellant. He was questioned for twenty-one pages of this record. The next venireman challenged for cause was Stormy Hurd. After questioning for two pages by the State, the court questioned Hurd for one-half page, became convinced that the venireman was properly subject to the State's challenge, and permitted no questions by appellant.[2] The procedure which occurred with regard to the remainder of the veniremen excused because they could not give the death penalty was essentially the same as that which occurred in the examination of Hurd.

The statutes which are relevant to our consideration of this ground of error are as follows:

Art. 35.17, § 2, Vernon's Ann.C.C.P.: When the state's attorney has made it known that he will seek the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

Art. 35.18, V.A.C.C.P.: Upon a challenge for cause, the examination is not confined to the answers of the juror, but other evidence may be heard for or against the challenge.

Art. 35.21, V.A.C.C.P.: The court is the judge, after proper examination, of the qualifications of a juror, and shall decide all challenges without delay and without argument thereupon.

---

1. For an exhaustive study of Witherspoon, attention is directed to our recent opinions of Harris v. State, Tex.Cr.App., 457 S.W.2d 903, and Morales v. State, Tex. Cr.App., 458 S.W.2d 56, and the cases there cited.

2. At the time the court refused to permit appellant to question Venireman Hurd, a total of four veniremen had been examined, over a period of three hours.

In De La Rosa v. State, Tex.Cr.App., 414 S.W.2d 668, the Court considered the right of the defendant to examine each of the prospective jurors. In that case, we held it was reversible error for the trial court to allow the State and defense only thirty minutes each to conduct their voir dire examination of the entire jury panel. De La Rosa is distinguishable on two grounds. First, in that case, the court placed an absolute time limitation on the total voir dire examination, a limitation which effectively denied the defendant the opportunity to examine each of the thirty-two veniremen, and which limitation we held to be unreasonable. Second, in De La Rosa, the harm which defendant suffered resulted from his inability to intelligently exercise his peremptory challenges. Neither of these circumstances is present in the case at bar. The defendant was allowed to question each venireman, with the exception of those who had been properly challenged because they could not give the death penalty. The denial of the right to intelligently exercise his peremptory challenges is not involved in this case at all; each of the prospective jurors which the defendant was not allowed to question was excluded for cause.

This Court first considered a trial court's denial of appellant's request to examine a venirewoman, after she was adequately shown to be disqualified under the Witherspoon rule, in Huffman v. State, Tex.Cr. App., 450 S.W.2d 858, 860. In Huffman, we held that the court should have granted appellant's request to examine her, but we held that this error did not call for a reversal.

The Supreme Court of California decided this question in People v. Nye, 78 Cal. Rptr. 467, 471, 455 P.2d 395, 399, a post-Witherspoon decision (1969). In that case, the court said:

"Each prospective juror who indicated that he entertained any conscientious scruples against the infliction of the death penalty was asked by the court (with an occasional slight variation in the wording of the question), 'Is it your frame of mind that you could not and you would not, under any circumstances, regardless of what the evidence might be, return a verdict carrying with it the death penalty?' Of the 25 prospective jurors ultimately excused because of their opposition to the death penalty, 23 indicated in positive terms, as soon as the court began questioning them, that they would not join in a verdict carrying with it the death penalty, no matter what evidence was presented."

Later in the opinion, the court said:

"There was no need for the court to permit such examination [by defendant] with respect to those prospective jurors who had clearly shown that they could not, or would not, under any circumstances join in a verdict imposing the death penalty."

On the basis of the above reasoning, we have concluded that once a juror has shown without question that he is subject to the State's challenge and that he meets the test in Witherspoon, it is not reversible error to deny questioning. The greatest lack of confidence in our judicial system arises when citizens are called for jury service in capital cases and then held at bay for days on end while their fellows are interminably questioned. Here a courteous and careful court concluded, and logically so, that each venireman excused was not a proper person to sit on a case where the State was seeking the death penalty; having so concluded, he excused the veniremen and selected a jury, not hurriedly, but with dispatch. Each venireman was questioned in turn; there was no preliminary screening as in Witherspoon.

III. We next consider the propriety of the court's refusal to permit appellant's counsel to ask the following numbered questions:

1. Would your reservation about capital punishment prevent you from making

an impartial decision as to the defendant's guilt or innocence?

2. Could you never vote to impose the death penalty?

3. Would you refuse even to consider the imposition of the death penalty regardless of what the facts in this case showed?

4. Would your conscientious scruples invariably compel you to vote against capital punishment?

5. Could you subordinate your personal view on the death penalty to what you perceived your duty to abide by your oath as a juror and to obey the law of this State?

6. Even if you believe that capital punishment should never be inflicted and even if irrevocably committed to its abolition. In short, even though you may have conscientious scruples against the imposition of the death penalty as punishment for a crime, could you make those scruples subservient to your duty as a juror and to obey the law of this State?

7. Would your position be that you would not necessarily vote for the ultimate penalty, but that you would reserve it for special, direct cases depending on the facts of the particular case?

8. Would your feeling regarding the death penalty interfere with the rules of law governing the presumption of innocence, burden of proof, rules of evidence, etc.?

9. In short, would the fact that the State is seeking the death penalty, cause you to presume that the defendant is guilty

of the offense for which he is charged or that you would not give the defendant the presumption of innocence to which he is entitled under the law as to the offense for which he is charged?

10. A juror cannot be excluded for cause simply because he indicates there are some kinds of cases in which he refuses to recommend capital punishment. Would you consider all of the penalties provided by the State law, not less than five years, up to life, up to death, and that you would not be irrevocably committed, before the trial has begun, to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the trial?

11. Are you automatically against the imposition of the death penalty and would so vote without regard to any evidence that might be developed at the trial of this case?

12. Is your attitude toward the death penalty such that this would prevent you from making an impartial decision as to the defendant's guilt?

13. Do you believe in the Biblical admonition of an "eye for an eye?"

14. What is the basis for your scruples against the imposition of the death penalty? Religious? Philosophical? Foundation?

The writer is convinced that it would have been proper to permit the appellant to propound questions 5, 6, 8, 10 and 12, but my brethren do not agree. Nevertheless, I have concluded that reversible error has not been shown in this case.[3]

---

3. According to footnotes 7 and 9 of the Witherspoon opinion, which describe the voir dire in Rhea v. State, 63 Neb. 461, 88 N.W. 789, questions 5 and 6 should have been permitted. The failure to allow these questions does not constitute reversible error in this case (in the opinion of this writer) only because the trial judge carefully ascertained that each venireman who was excused was actually disqualified under Witherspoon, in a

studious effort to comply with the mandate of that case.

The jury selection consumed most of the court's time from December 2nd, when it began, until the jury was complete on December 10th. This is a far cry from the relatively short time expended in the jury selection in the Witherspoon case. We have examined the court's docket and the record as a whole, and we have calculated that it took one-third as long

■ The above is a discussion of appellant's first three grounds of error. In his fourth point, he complains that the prosecutor exhibited before the jury a "cane" or "linoleum" type knife, which the prosecutrix said was identical to the knife used by appellant when he threatened her life and that of her husband and child, who were present in the same room when appellant attacked her sexually and forced her to commit acts of sodomy with him. As in Grant v. State, Tex.Cr.App., 450 S.W.2d 642, we find no reversible error. A portion of the time the knife was shown to the witness the jury was out of the courtroom. In the absence of the jury, the prosecutrix stated that the prosecutor had shown her more than one knife prior to the trial, in attempt to find a knife like the one used by her assailant. She testified that the knife in question here was "exactly" like the one used by appellant. There is no showing of lack of good faith on the part of the prosecutor.

■ Appellant's fifth ground of error is that the court erred in permitting the introduction into evidence of pictures of the home of the prosecutrix. The record reflects that the only complaint here raised is that the word "rape," the date and address appeared on the exhibit. When the court stated, "How do you suggest," appellant's counsel failed to make a suggestion and thereby waived his objection. Powdrill v. State, 159 Tex.Cr.R. 618, 266 S.W.2d 879, is easily distinguishable from the instant case. In Powdrill, the words, "purchased from [appellant]" appeared on a bottle of beer. The question of whether or not the beer was sold was an operative fact in that case, whereas in the case at bar there was no dispute as to the fact that a rape had been committed on the day in

question and at the address set forth in the exhibit.

While it would have been proper to have masked out the words on the exhibit before it was shown to the jury, in this case there was no issue raised about the fact that a rape had been committed at the address shown. Thus, the exhibit told no more than what the testimony had established. This was clearly not reversible error.

■ Appellant's sixth ground of error is that the court erred in permitting an in-court identification of appellant by prosecutrix without first conducting a hearing in the absence of the jury to establish that the basis for the in-court identification met the standards of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. It is apparent from the record that appellant's attorney, Tucker, signed as a witness to appellant's written waiver of the presence of his attorney at the line-up. Furthermore, appellant has failed to point out any specific error that allegedly occurred in the line-up.

■ His seventh, eighth, eleventh and thirteenth grounds of error relate to the following questions which the State's counsel propounded to the prosecutrix:

As you saw him hiding there by the bed with this—however this is described, a cane knife or linoleum knife, or however you describe it, will you tell the jury what he said to you and your husband and your little child there in the bed with you in your home here in Houston, Harris County, Texas?

\* \* \* \* \* \*

Had you been instructed by the doctor with relation as to whether or not you were to have sexual relations?

to present all the evidence at the guilt stage of the trial as it did to select the jury. The jury selection comprises approximately 1,275 pages of this voluminous record.

Of the eighty-four veniremen questioned, twenty-four were excused because of their inability to inflict the death penalty. Both the State and appellant used all fifteen of their peremptory challenges; there were no requests for additional challenges.

\* \* \* \* \* \*

And was this at the emergency room of the Ben Taub County Hospital?

\* \* \* \* \* \*

Taking into consideration everything of this case is there any doubt that this man, Ortega, is the one who committed these atrocities upon you and your family?

Earlier in this writer's term on this Court in Deams v. State, 159 Tex.Cr.R. 496, 265 S.W.2d 96, we had occasion to write on the issue of leading questions, and citing earlier authority, we held that this Court seldom reversed, "because questions are leading." Appellant cites this Court to Mounts v. State, 148 Tex.Cr.R. 177, 185 S.W.2d 731, in which the court reversed the conviction. In Mounts, the question, which amounted to a question about an extraneous offense or specific act of misconduct by the accused, was asked twice. The second time the prosecutor asked the question, after the court sustained appellant's objection to the first question, he stated a specific date, time and location of the alleged act. In overruling the State's motion for rehearing, the court stated:

> \* \* \* only in rare instances would we feel called upon to reverse a case solely because an improper question may have been propounded \* \* \* that question must be of an obviously harmful character carrying with it injury to the accused on trial.

The questions objected to in the instant case were not so obviously harmful as to require reversal.

■ His ninth and tenth grounds of error relate to the prosecutor's questions and the prosecutrix's testimony which showed that immediately after appellant left her home she comforted her husband and the small child, both of whom were present and witnessed the rape, and investigated as to the welfare of her other two children, prior to calling the police to report the rape. Clearly what the prosecutrix did immediately after appellant's departure, and before her outcry to the police, was a part of the res gestae of the offense and admissible.

■ His twelfth ground of error relates to the admissibility of the prosecutrix's testimony that she believed that appellant would have killed her baby had she not acquiesced in the act of intercourse and both acts of sodomy. This testimony was clearly admissible on the issue of consent.

In his fourteenth and twenty-first grounds, appellant complains that the court erred in refusing to grant his motion regarding cross-examination of the prosecutrix and her husband. At the conclusion of the direct testimony of the victim, and at the conclusion of the direct testimony of her husband, appellant presented a motion to the court in which he asked the court to rule as follows:

> \* \* \* Regardless of any cross-examination and regardless of whether the said witness may be impeached by the cross-examination \* \* \* that the State of Texas, will not, by virtue of such cross-examination, be permitted to introduce evidence in relation to any extraneous offense or offenses, if any, for the purpose of showing motive, system, design, identity or intent of this Defendant in reference to this cause.[4]

Appellant did not cross-examine either the prosecutrix or her husband. Without the knowledge of the issues which might be raised on cross-examination or the questions appellant wished to ask, and without the knowledge of what extraneous offenses the prosecutor would attempt to introduce, and the manner in which he would do so, this Court, like the trial court, cannot possibly hold that any evidence of extraneous offenses would be inadmissible. Appellant

---

4. Appellant was under indictment for twenty-one (21) felonies of which approximately fifteen (15) were for capital offenses, at the time of his trial.

cites us no authority for his proposition, and we know of no such holding.

Appellant's fifteenth ground of error relates to the testimony of Officer Kainer. The prosecutrix called the police station moments after appellant left her home, and Officer Kainer arrived at her house about five minutes later. His testimony, which concerns the proescutrix's statements to him upon his arrival, as well as her condition and that of her husband, was properly admissible as was prosecutrix's outcry following the rape. See Tex. Jur.2d, Rape, § 56 (1963).

Appellant's sixteenth and eighteenth grounds of error relate to the trial court's order, on motion by the State, that Officer Foster be allowed to examine appellant in order to determine whether or not he had been circumcised, and to the officer's testimony that appellant had not been circumcised. The prosecutrix had previously testified that her assailant was not circumcised. This testimony therefore, relates to the issue of identity.

Appellant argues that the testimony and examination were in violation of his rights under the United States Constitution. We find no constitutional prohibition against this action. See Coleman v. State, 151 Tex.Cr.R. 582, 209 S.W.2d 925 and Lane v. United States, 321 F.2d 573 (5th Cir., 1963).

Appellant contends that Officer Foster was not a proper person to make the examination because, although he was an expert fingerprint examiner, he was not shown to have expert knowledge regarding the examination of a male's private parts and whether or not said male had been circumcised. We hold that expertise is not required as a predicate to this examination and testimony. The officer testified that he had two sons who had been circumcised; that he had, as part of his employment, photographed prisoners' bodies; and that in connection with athletics and police training he had showered in shower rooms with many other adult males. This testimony is sufficient to show that the officer could distinguish between a circumcised penis and an uncircumcised penis.

In appellant's seventeenth point of error, he contends that the trial court erred in refusing to grant his motion that Officer Kainer be ordered to examine the penises of every prisoner in the Harris County jail. He cites us no authority for this contention; we hold it is without merit.

His nineteenth and twentieth grounds of error relate to proof by the prosecutrix's husband as to appellant's identity. The court sustained appellant's objection and instructed the jury not to consider the answer, "yes sir, that's him right there."

The trial court later in the trial concluded the prosecutrix's husband had sufficient opportunity to observe appellant at the scene and at another time prior to his arrest to testify as to his identity. Furthermore, appellant, with his attorney as a witness, signed a written waiver of his right to an attorney at the line-up. We agree with the trial court and find no error in admission of the husband's testimony.

His twenty-second ground of error does not set forth the argument of which he seeks to complain and therefore presents nothing for review.

His twenty-third and twenty-seventh grounds of error present an interesting question. Appellant submitted a motion to suppress the testimony of certain witnesses prior to their being called by the State at the punishment stage to testify as to appellant's reputation. His grounds for doing so were that these witnesses were themselves injured parties, husbands or close friends of injured parties, or investigators in the twenty-one felonies pending against appellant. If they testified regarding these offenses, a serious problem would have arisen, however, they made no mention of the crimes. We have examined with care the testimony of such witnesses and find that the cautious trial judge pre-

vented the jury from hearing or learning about these crimes. No error is shown, either in the court's refusal to grant the motion to suppress or in his refusal to limit the number of reputation witnesses against the appellant.

■ Appellant's twenty-fourth ground of error relates to the court's failure to allow him to take the above mentioned witnesses on voir dire examination prior to the punishment hearing, and prior to the time that they were called to testify by the State, in order to show that they were material witnesses in the cases pending against appellant. The court did allow appellant to take the prosecutor on voir dire examination, and through his testimony appellant elicited the facts relating to his motion. In addition, the court noted that he was not restricting appellant's right to take these witnesses on voir dire examination as they were called. Appellant did not request to take them on voir·dire when they were called. We find no error in the court's action.

■ His twenty-fifth ground of error is that the court refused to discharge the jury and to set the punishment himself. Art. 37.07, § 2, V.A.C.C.P. provides that " * * * in capital cases where the state has made it known in writing prior to trial that it will seek the death penalty * * * the punishment shall be assessed by the * * * jury. * * *" It would have been error for the trial judge to assess the punishment in this case, Jones v. State, Tex.Cr. App., 416 S.W.2d 412.

His twenty-sixth ground relates to the trial court's refusal to suppress State's Exhibit Number One at the punishment hearing. The use of such exhibit has heretofore been discussed in this opinion.

His last ground of error, not supported by authority, is that the entire punishment

hearing was conducted in such a manner as to make it unlawful. We do not agree.

Finding no reversible error, the judgment of conviction is affirmed.

WOODLEY, P. J., concurs in the result.

ONION, Judge (concurring).

I reluctantly concur. The State sought and secured the death penalty. Eighty-four prospective jurors were interrogated on voir dire. Of these, 24 were excused upon challenges for cause by the State because of their opposition to the death penalty as a punishment for crime. The appellant was not permitted any voir dire examination of 23 of these prospective jurors. Each of these individuals was challenged for cause by the State after some interrogation. They were then interrogated by the trial judge. Upon being convinced the jurors were disqualified under the statute and the Witherspoon mandate, the judge sustained the challenge in each instance without permitting (though requested) any voir dire examination at all by the appellant. No opportunity for rehabilitation was allowed. While the trial court should have broad discretion in limiting voir dire examination, such discretion can be abused. While reversible error may not be reflected by the particular circumstances of this case, I would caution trial judges against using this decision as authority for the proposition that once a juror has answered questions in such a way as to meet the Witherspoon test and subject himself to the State's challenge for cause, the right of the defendant who is on trial for his life may be completely denied any right to question the prospective juror at all. I do not read the statutes as indicating this to be the legislative intent.[1] If such practice is allowed to persist it would only be logical to permit it to extend to all challenges for cause and hold it not reversible error to refuse voir dire examination by the defense.

---

1. One exception would be where a prospective juror has formed a conclusion or opinion as to the guilt or innocence of the accused which influences him in finding a verdict. This is, however, an express statutory exception. Article 35.16, V.A.C.C.P.